**RODGERS et al. v. LAWSON.**

No. 9567.

United States Court of Appeals District of Columbia.

Argued Dec. 5, 1947.

Decided June 1, 1948.

Mr. Jeff Busby, with whom Mr. Jeff Busby, Jr., was on the brief, for appellants.

Mr. John R. Daily, with whom Messrs. H. Mason Welch and J. Harry Welch, who entered appearances, were on the brief, for appellee.

Before GRONER, Chief Justice, and STEPHENS and CLARK, Associate Justices.

STEPHENS, Associate Justice.

This is an action for malpractice brought against the appellee, Dr. Huron W. Lawson, by the appellants, Mary F. Rodgers and Edgar J. Rodgers, husband and wife. Their complaint charged permanent injury and disfigurement of Mrs. Rodgers' right breast and pain and suffering, through fail-

ure of Dr. Lawson to use reasonable skill and care, and through use by him of unsterilized instruments, in treating Mrs. Rodgers after the birth of her child. It was sought by the evidence introduced by the plaintiffs to particularize inattention, refusal by the defendant to inform himself as to Mrs. Rodgers' condition, failure to make a proper diagnosis, inadequate operative measures and abandonment of the case. Mrs. Rodgers sought damages for herself. Mr. Rodgers sued for expenses alleged to be attributable to Dr. Lawson's neglect, and for loss of services and consortium of his wife. At the close of the plaintiffs' case, the trial court, on a motion for Dr. Lawson, directed a verdict in his favor upon the ground that there was no evidence either that he was negligent or that his conduct caused the injuries alleged.

The principles of law governing malpractice actions are well settled. A physician "must exercise that degree of care and skill ordinarily exercised by the profession in his own or similar localities." 3 Cooley, Torts § 473 (4th ed. 1932). Cf. Kasmer v. Sternal, 1948, 83 U.S.App.D.C. —, 165 F.2d 624; Christie v. Callahan, 1941, 75 U.S.App.D.C. 133, 124 F.2d 825; Gunning v. Cooley, 1929, 58 App.D.C. 304, 30 F.2d 467, affirmed, 1930, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Cayton v. English, 1927, 57 App.D.C. 324, 23 F.2d 745; Levy v. Vaughan, 1914, 42 App.D.C. 146; Napier v. Greenzweig, 2 Cir., 1919, 256 F. 196. The burden of proof is upon a plaintiff to establish by substantial evidence departure from that standard and that such departure caused the injury complained of. The ultimate question on this appeal is whether the trial court correctly ruled that the plaintiffs had not sustained this burden.

There were three witnesses for the plaintiffs, Mr. and Mrs. Rodgers themselves, and a Dr. John H. Bailey. Their testimony was as follows:

*Mrs. Rodgers* testified that Dr. Lawson was retained for prenatal care, for the delivery of her baby, and for postnatal care. The baby was born on July 9, 1946, at Doctors Hospital in the District of Columbia, where Mrs. Rodgers remained until the 19th of the month. On the 14th she

complained to the doctor that her right breast was sore during and after nursing. Again, on the 15th, she complained of this soreness. On those days Dr. Lawson made no actual examination of her breast; he informed her that such soreness was customary with a first baby. On the evening of the 15th, Mrs. Rodgers noticed that the baby was nursing blood. On the morning of the 16th Dr. Lawson examined her breast, and said that the nipple was cracked, that she should not nurse the baby on it, that ice packs should be applied; he prescribed also tincture of benzoin.[1] On the 17th and 18th of the month, Dr. Lawson visited Mrs. Rodgers, but he made no further specific examination of her breast until after she returned to her home on, as said above, the 19th. Thereafter her breast was throbbing and paining and getting larger and hard. Mrs. Rodgers and her husband talked to Dr. Lawson almost every day by telephone, describing her condition. On the 22nd, when told of the condition of her breast, he said that it appeared that infection was present, and ordered the treatment changed to hot Epsom salts packs. The doctor first came to the home, however, on the 25th of July. He then examined the breast and thereafter, with the assistance of another doctor for the administration of an anesthetic, made an incision for drainage. The incision disclosed a minor amount of pus. Thereafter until the 29th of the month, he prescribed hot Epsom salts packs and heat pads, and these were applied. The breast pain increased, however, and on the 29th Dr. Lawson prescribed penicillin, which was administered at regular intervals for two days. On the second of these, Dr. Lawson visited Mrs. Rodgers again at her home and on one occasion later. At that time he told her to come to his office the following week. This she did, during the first week of August. There had been some relief as the result of the penicillin, but in the meantime the other side of the same breast had "started up." At his office, Dr. Lawson gave Mrs. Rod-gers a complete physical examination and told her that if she would continue to apply heat the breast would drain further through the opening made. She continued, however, to suffer pain, of which Dr. Lawson was informed. On August 13, she had a temperature, the "pounding and throbbing" had become so severe that she felt she must have relief, and she did not feel able to go to Dr. Lawson's office again. The doctor would not come to the house, and therefore Mr. Rodgers talked to him. Mr. Rodgers thereafter retained Dr. Bailey, on the recommendation of "Group Health." By appointment made by Group Health on the same day, August 13, Mrs. Rodgers went to Dr. Bailey's office—some five hours after the call to Dr. Lawson. Dr. Bailey examined her breast and made arrangements for an operation at Garfield Hospital. This operation he performed the same evening, incising the breast and inserting tubes for drainage. Mrs. Rodgers experienced some relief from the thumping and pressure soon after the operation. Dr. Bailey examined the incision daily, noted the amount of drainage, and changed the dressing. He also prescribed sedatives. Dr. Lawson had administered no sedatives.

*Mr. Rodgers* testified that about eleven o'clock on the morning of August 13 he called Dr. Lawson and told him that Mrs. Rodgers' condition was serious, that she was becoming hysterical from loss of sleep and continuing pain and should have immediate treatment. Dr. Lawson asked that she come to his office, stating that he was having office hours and could not himself come out, and that he had no associate or other doctor that he could send. Mr. Rodgers deemed it not practical to move Mrs. Rodgers, thinking her condition too serious. He therefore asked Dr. Lawson if he had any objection to another doctor's being consulted. Dr. Lawson replied, with some perturbation, "No, go ahead and consult another doctor"—that he would release the case. Mr. Rodgers then made a five o'clock appointment for Mrs. Rodgers at Dr.

---

[1] There is evidence that the ice packs prescribed, as testified, on the 16th, were to be obtained and applied by the hospital nurses and that they were not furnished until the 18th. But there is no evidence that this was made known to Dr. Lawson; and the negligence, if any, of the nurses is not attributable to him since they were not his servants. The selection of the hospital, according to the evidence, was made by Mrs. Rodgers.

Bailey's office, and from there she went to Garfield Hospital where she was operated upon. She remained in that hospital twelve days, and some two or three weeks later returned for five or six days more.

*Dr. Bailey* testified that he was familiar with obstetrics. Upon examining Mrs. Rodgers he found that she had had one incision in the region of the nipple which had been draining for a week, and that a further area in the same region had been draining spontaneously. He found the breast tender in the upper quadrant and around the nipple, and it appeared to be elevated from the chest wall—a condition which could be caused by milk, pus, fat, blood or serum. Mrs. Rodgers had apparently had a fissure, a common condition in pregnancy, and from that a cracked nipple—the possible point of entrance of the infection, also common. Dr. Bailey did not open the incision already made, because that and the spontaneous drainage had apparently effected drainage of the area around the nipple. But a loculated mass in the lower part of the breast needed an incision, and one of a different type, and he accordingly incised the breast where it was attached to the chest and "freed up" the breast, i.e., elevated it, and put drains in both areas. He found loculated milk, that is, that the milk was in pools. Dr. Bailey saw Mrs. Rodgers and examined her breast daily while she was in Garfield Hospital. He thought it fair to say that the lumpy condition which he found in her breast had been there for more than a few minutes—four hours at least—but that it was not possible to state when it had started, because fluid can accumulate behind any tubular structure suddenly or slowly—that milk might get plugged up in fifteen or twenty minutes and begin to swell. Dr. Bailey testified, in answer to the question whether, when he saw her, Mrs. Rodgers needed incision and drainage: "Well, I think to answer that question, you need someone besides me, because it has been my short experience with the treatment of postpartum patients that many develop loculated areas of fluid in the breast and continue to resolve it, although conservative symptomatic treatment is often given." But he said that it was his opinion that Mrs.

Rodgers needed to be drained. He testified also that she apparently completely healed up under the treatment he gave her; that the treatment may have been a little more prolonged than usual, although it may not have been; that it was difficult to evaluate how long it would take such conditions to heal up.

This review of the evidence introduced by the plaintiffs discloses, in our view, that the trial court correctly directed a verdict for the defendant. There is lacking substantial evidence of failure by Dr. Lawson to exercise the degree of care and skill ordinarily exercised by the profession in this or similar localities for such a post-natal breast condition as that suffered by Mrs. Rodgers. It is urged for the plaintiffs that expert evidence is not necessary for proof of negligence in non-technical matters, or in those of which an ordinary person may be expected to have knowledge, or where lack of care and skill is obvious. Such cases as Whetstine v. Moravec, 1940, 228 Iowa 352, 291 N.W. 425, and Russell v. Newman, 1924, 116 Kan. 268, 226 P. 752, are relied upon. In the first of these, the evidence tended to show that in the course of an extraction under anesthesia the root of a patient's tooth had been permitted to pass into his lung, with resultant serious injury. It was held that the operation and instrumentalities having been under the sole control of the defendant extractionist the doctrine of res ipsa loquitur applied, so that in the absence of evidence to the contrary produced by the defendant the jury was entitled to conclude that the event was a consequence of his neglect. It was held that expert testimony to establish neglect was not necessary. But the court recognized this as an exception to the general rule, referring to the distinction between cases involving the merits of a diagnosis and scientific treatment and those in which during the performance of a surgical or other skilled operation an ultimate act or omission takes place which does not require scientific opinion as a criterion of due care. In the second case it was held, in accordance with this distinction, that it did not require expert testimony to show that it was negligence for a surgeon to leave a sponge in an incision after removal of a kidney. But

this was recognized as an extreme case qualifying the general rule that the testimony of witnesses skilled in medicine and surgery is necessary to establish malpractice, i.e., departure from the required standard of professional care. The instant case is not comparable to such cases as these. It involves a question of the merits of a diagnosis and scientific treatment. This cannot be determined by a lay jury without the aid of expert opinion. Cayton v. English, supra; Ewing v. Goode, C.C., W.D. Ohio, 1897, 78 F. 442. No expert testimony was introduced by the plaintiffs tending to show that in Dr. Lawson's diagnosis and treatment of Mrs. Rodgers' case he fell below the required standard of professional care or that his diagnosis was incorrect. Indeed, such expert evidence as there is in the case—that of Dr. Bailey—indicates that Dr. Lawson was confronted in Mrs. Rodgers, as was Dr. Bailey himself, with a case of lumpy breast due to the collection of milk in pools, common in postnatal cases, and that, until infection developed, requiring incision and drainage, Dr. Lawson was following the conservative symptomatic treatment often given with resultant resolution of such an abnormal condition.

Concerning inattention and refusal by Dr. Lawson to inform himself as to the nature of Mrs. Rodgers' condition by daily personal examination of her breast, it is not shown that such daily examination was required in the exercise of proper professional care. Nor is it shown that Dr. Lawson could not properly, in view of the nature of the ailment, inform himself, as he did, through daily calls upon Mrs. Rodgers and reports by her of her condition while she was in the hospital, or through frequent telephoned reports of Mrs. Rodgers' condition after she returned home, together with such actual examinations as he did make, both in the hospital, the home and his office. Such a case as Tadlock v. Lloyd, 1918, 65 Colo. 40, 173 P. 200, relied upon by the plaintiffs, is inapposite. There a physician, called to attend a sick child, after rubbing his hand across the child's back and taking him by the arm, diagnosed the case as scarlet fever. He made no other examination and gave no instructions as to the care to be given the child except that he left pills for the mother to administer and gave directions for frequent bathing. Thereafter the doctor declined to visit the child, saying that the disease must run its course. Only after urgent request did he finally come to the house again, the child dying shortly after his arrival. There was expert testimony that the child died of uremic poisoning, an affliction of the kidneys attendant upon scarlet fever, lay testimony that he died of an accumulation of phlegm in the throat, expert testimony that this condition was to be guarded against in the progress of scarlet fever. There was expert testimony also that the manner of examination and treatment of the child was not that usually practiced, and that the doctor had not exercised the care and attention necessary and proper under the circumstances. Moreover, the doctor himself expressed regret for not having visited the child when first called on the day of its death, in effect admitting that had he done so the child's life might have been saved.

As to Dr. Lawson's operative measures: There is no evidence that the incision he made was inadequate, or that he made the incision too late or too early, in view of the condition of the breast, or that he should have taken either more or less radical measures. The fact that another part of the breast also became involved does not establish inadequacy of the operative measures taken. The evidence in this respect was at the most equivocal and therefore not substantial. Pennsylvania Railroad Co. v. Chamberlain, 1933, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819. Moreover, it was the view of Dr. Bailey that Dr. Lawson's "incision and the one that had drained spontaneously, had apparently effected drainage of whatever was incised . . . ." There is no evidence that Dr. Lawson's instruments were unsterilized.

██ In support of the charge of abandonment, the plaintiffs rely upon the proposition that "a physician cannot discharge himself from a case and relieve himself of responsibility for it by simply abandoning it or staying away without notice to the patient. . . ." 41 Am.Jur., Physicians and Surgeons § 102. But there is no evi-

dence that Dr. Lawson abandoned Mrs. Rodgers' case. On the contrary it is shown that upon the request of the plaintiffs he consented to the substitution of another physician. As to the refusal of Dr. Lawson to visit Mrs. Rodgers on August 13, during his office hours, there is no showing that her condition on that day required that in the exercise of due professional care Dr. Lawson make an immediate house call upon her. On the contrary, it is affirmatively shown that Mrs. Rodgers was able on the same day to go to Dr. Bailey's office; it is to be inferred therefore that she could have gone to Dr. Lawson's office.

It is true that the evidence shows that Mrs. Rodgers suffered severe pain for an extended period. But this, without more, does not evidence neglect by the defendant. The pain was obviously the result of the pooling and pressure of the milk. This common postnatal condition was, so far as the evidence shows, brought about by nature, not by the defendant. There is no evidence that due professional care required the administration of sedatives. It appears from Dr. Bailey's testimony that the profession recognizes both incision and drainage on the one hand, and the more conservative treatment of symptoms on the other, as proper measures. Early incision and drainage would apparently, in view of the relief after Dr. Bailey's incision, have lessened the pain. But it is not shown that it was a departure from proper professional judgment for Dr. Lawson to choose to postpone incision until infection appeared and failed to respond to the treatment with hot Epsom salts packs and penicillin. It is common knowledge that even "minor" surgery is fraught with danger and that good professional judgment at times requires exposure to pain rather than to the knife, that is to say, leaving the patient to the restorative process of nature, aided medicinally rather than by surgery.

There is, finally, no evidence whatever to support the charge of the plaintiffs that Mrs. Rodgers was permanently injured or disfigured. On the contrary, Dr. Bailey testified that she made a complete recovery.

Affirmed.