Grace Fisher **BROWN**, Appellant,

v.

John F. **KEAVENY**, Appellee.

No. 17490.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 17, 1963.

Decided Dec. 12, 1963.

Petition for Rehearing En Banc Denied Jan. 15, 1964.

J. Skelly Wright, Circuit Judge, dissented.

Mr. Earl H. Davis, Washington, D. C., for appellant.

Mr. H. Mason Welch, Washington, D. C., with whom Messrs. J. Harry Welch, J. Joseph Barse, Walter J. Murphy, Jr., and James A. Welch, Washington, D. C., were on the brief, for appellee.

Before WASHINGTON, DANAHER and WRIGHT, Circuit Judges.

PER CURIAM.

This is a malpractice case, in which the complaint alleged that the defendant oral surgeon had negligently performed an operation for the removal of diseased and impacted teeth, during which plaintiff's jaw was broken. The trial court directed a verdict for defendant, at the close of plaintiff's case, on the issues of specific negligence and res ipsa loquitur. It left with the jury the issue of warranty; this was ultimately decided in favor of defendant. This appeal followed.

We find no error affecting substantial rights. Plaintiff offered no evi-

idence of specific negligence, or evidence that defendant did not exercise " 'that degree of care and skill ordinarily exercised by the profession in his own or similar localities'." Rodgers v. Lawson, 83 U.S.App.D.C. 281, 282, 170 F.2d 157, 158 (1948). As to res ipsa loquitur, that doctrine applies only "where the occurrence complained of ordinarily would *not* happen in the absence of negligence." Quick v. Thurston, 110 U.S.App.D.C. 169, 172, 290 F.2d 360, 363, 88 A.L.R.2d 299 (1961). "The thing does not speak for itself" unless a layman can say as a matter of common knowledge that the consequences of the professional treatment are not those which ordinarily occur if due care has been exercised. The plaintiff may not rest his case on the mere fact of his injury or rely upon the jury's untutored sympathies. In short, where the question turns on the merits and the performance of scientific treatment, the issue may not be resolved by the jury without the aid of expert opinion. Here the plaintiff offered no such evidence. Rodgers v. Lawson, *supra,* 83 U.S.App. D.C. at 285, 170 F.2d at 161; Hohenthal v. Smith, 72 App.D.C. 343, 346, 114 F.2d 494, 497 (1940).

Affirmed.

WRIGHT, Circuit Judge (dissenting):

The court finds that the patient's claim founders on the wall of protection with which the law surrounds the doctor. I would hold that the jury should have been permitted to decide whether an inference of negligence should be drawn from the fact that, in removing her tooth, the doctor fractured her jaw.

The law of malpractice is clearly defined in most jurisdictions as it is here. Before the plaintiff-patient can recover, he must show that his injury resulted from his doctor's failure to exercise that degree of care and skill exercised by a doctor practicing the same speciality in his locality.[1] In mounting such proof, the plaintiff must prove by testimony from the defendant's own professional colleagues what the degree of care and skill in the area is and that the defendant failed to exercise such care and skill.[2] The human instinct for self-preservation being what it is, there is often disclosed in the trial of these cases what has been referred to as the conspiracy of silence—the refusal on the part of members of the profession to testify against one of their own[3] for fear that one day they, too, may be defendants in a malpractice case.

In an effort to lighten this enormous burden, plaintiff-patients have sought to use the doctrine of res ipsa loquitur,[4] on the theory that, at least in those cases where the conditions which cause the injury are completely under the control of the doctor, the patient has no way of knowing, and therefore showing, what the doctor did that lacked the degree of care and skill required by the law. Most courts have now recognized the application of this doctrine in malpractice cases, but in a very limited area. Where the cause of the injury is such as to be obvious to the lay mind, like leaving a sponge or a surgical instrument in the body during an operation, no expert medical testimony is required to show that, but for negligence on the part of a surgeon, the injury would not have

1. Quick v. Thurston, 110 U.S.App.D.C. 169, 290 F.2d 360 (1961); Christie v. Callahan, 75 U.S.App.D.C. 133, 124 F.2d 825 (1941); Sweeney v. Erving, 35 App. D.C. 57, 43 L.R.A.(N.S.) 734 (1910), affirmed, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815 (1913); Prosser, Torts (2d Ed.) § 31, pp. 132–134 (1955).

2. Ibid.

3. Christie v. Callahan, *supra* Note 1, 75 U.S.App.D.C. at 136, 124 F.2d at 828; Overcoming the "Conspiracy of Silence": Statutory and Common-Law Innovations, 45 Minn.L.Rev. 1019 (1961); Prosser, *op. cit. supra* Note 1, § 31, p. 134.

4. Literally translated: The thing speaks for itself.

resulted.[5] This court has recognized the application of *res ipsa* in such situations.[6]

*Res ipsa* is a rule of evidence which permits an inference of negligence where the incident in suit ordinarily would not occur in the absence of negligence. The important word in the definition of *res ipsa* is "ordinarily." In order to invoke the doctrine, "[t]he plaintiff is not required to eliminate all other possible causes, or inferences; and all that is needed is evidence from which reasonable men can say that on the whole it is more likely that there was negligence associated with the cause than that there was not." Prosser, *op. cit. supra* Note 1, § 42, p. 204. Primary to the application of the doctrine is exclusive control in the defendant of the cause of the injury. Once this control is established and the resulting "injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care." San Juan Light Co. v. Requena, 224 U.S. 89, 98–99, 32 S.Ct. 399, 401, 56 L.Ed. 680 (1912). In short, when the result is extraordinary and injurious, "a jury may fairly find that [it] occurred as a result of negligence." Jesionowski v. Boston & Maine R. Co., 329 U.S. 452, 458, 67 S.Ct. 401, 404, 91 L.Ed. 416 (1947).

The patient here entered the office of the doctor, a specialist in oral surgery, to have an impacted molar removed. After a short wait a general anesthetic, sodium pentothal, was administered. The operation to remove the impacted molar involved chipping the jawbone using a hammer and chisel. After the operation the doctor did not realize he had broken the jawbone, in spite of the fact that it was a compound fracture, that is, the broken bone was showing through the tissue. His attention to the fracture was called by his nurse.

When the defendant was asked on cross-examination, "What broke her jaw, Doctor?" he answered, "We don't know. I am of the opinion that there must have been a muscle contraction and that muscle contraction broke the jaw. Just the same as a baseball player will break his arm, throwing the ball." When asked whether he saw "any muscle contraction while [he was] working on Mrs. Brown's mouth," the doctor answered, "No. No, I did not." When asked, "Doctor, at any time that you used this mallet on this chisel, is it possible that you struck that chisel too hard and that it would fracture the jawbone?" he answered, "Well, I think if you used a great deal of force, but I think a man who has experience will adjust the amount of force to meet the situation." The doctor further testified that in his experience he had handled between fifty and sixty thousand patients and that a great many of them involved the removal of impacted teeth. When asked on how many prior occasions he had fractured a patient's jaw, he stated, "Oh, I guess two or three times."

On the basis of this testimony, it is clear that fracturing the patient's jaw was indeed an extraordinary and injurious result from removing a tooth. It had happened only two or three times in the doctor's prior experience. Obviously, an inference could reasonably be drawn, as the doctor's testimony indicates, that, when due care is used with the hammer and chisel, the jawbone is not fractured. The jury would not have to have experts explain how a hammer and chisel negligently used may fracture a jawbone. Such a result under such use is easily understandable even by laymen.

Consequently, it would appear to me that, when a doctor fractures a jaw in removing a tooth, at least the burden of going forward with the evidence should be on him to show that this extraordinary result was not caused by his negligence.

---

5. See Prosser, *op. cit. supra* Note 1, § 42, pp. 210–211, and cases there cited.

6. Christie v. Callahan, *supra* Note 1, 75 U.S.App.D.C. at 136, 124 F.2d at 828, and cases there cited in n. 13.

In order to avoid an inference of negligence, he should be required to show that his ministrations to his patient were in accord with "that degree of care and skill ordinarily exercised by the profession in his own or similar localities." Rodgers v. Lawson, 83 U.S.App.D.C. 281, 282, 170 F.2d 157, 158 (1948). Compare Ambrosi v. Monks, D.C.Mun.App., 85 A.2d 188 (1951). Certainly he is in a better position to make this explanation than the patient who was alone and under a general anesthetic when her jaw was broken.

I realize, of course, that even though doctors have a special competence in their chosen profession, they should not be required to explain the cause of injury or death resulting from their treatment. Doctors sometimes are no more able to explain the mysteries of life or death than laymen. But where a doctor is in absolute control of a situation which results in unusual and serious injury to his patient, at the very least he should have the obligation of showing that he was free from fault—that his treatment accorded with the standard of care maintained by his professional colleagues in his community. Proffering such proof would doubtless come easier to him than proof to the contrary to his patient.

This protective wall which the law has erected around doctors is founded on the philosophy that if an extraordinary and injurious result "were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that the flesh is heir to.'" Ewing v. Goode, C.C.S.D.Ohio, 6 Cir., 78 F. 442, 443 (1897). See Quick v. Thurston, supra Note 1, 110 U.S.App.D.C. at 172, 290 F.2d at 364. This philosophy may have been sound in the nineteenth century before the days of liability insurance. But today, with insurance, financial responsibility is not one of the dangers to the doctor in a malpractice suit.

Respectfully, I dissent.