**WASHINGTON HOSPITAL CENTER,**
**Appellant,**

v.

**Robert BUTLER, Administrator of the**
**Estate of Beatrice H. Butler,**
**Deceased, Appellee.**

**James E. WISSLER et al., Appellants,**

v.

**Robert BUTLER, Administrator of the**
**Estate of Beatrice H. Butler,**
**Deceased, Appellee.**

**Nos. 20368, 20369.**

United States Court of Appeals
District of Columbia Circuit.

Argued May 3, 1967.

Decided Sept. 29, 1967.

---

Mr. Thomas Penfield Jackson, Washington, D. C., with whom Mr. John L. Laskey, Washington, D. C., was on the brief, for appellant in No. 20368.

Mr. Walter J. Murphy, Jr., Washington, D. C., for appellants in No. 20369.

Mr. Alfred M. Schwartz, Washington, D. C., for appellee.

Before EDGERTON, Senior Circuit Judge, and McGOWAN and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

These appeals emanate from a judgment[1] on a verdict for appellee, as administrator of the estate of his wife. Beatrice H. Butler, against appellants,[2] a hospital and a partnership of radiologists maintaining a laboratory in the hospital premises,[3] in an action charging negligence contributing to a fall by and resulting injuries to Mrs. Butler during the course of diagnostic X-irradiation in the laboratory shortly before her death,[4]

Mrs. Butler, who had been receiving treatment from her personal physician for diabetes, became a patient in the hospital on March 23, 1962. The physician's admission note, entered on her hospital chart the following day, recited that she had experienced "recent weakness, dizziness, and near-syncopal episodes for about 8 days." The physician ordered certain diagnostic tests, including an intravenous pyelogram—an X-ray examination of the kidneys during retention of a dye substance previously injected into the blood stream.

The hospital's arrangements for the pyelogram included a requisition prepared by a nurse. The requisition form contained space for a summary of the patient's history, information the form

---

1. See *infra* note 4.

2. Mrs. Butler's personal physician was joined as a defendant to the action. A verdict in his favor was directed at the close of appellee's case in chief.

3. The laboratory was maintained by the radiologists independently of the hospital and was subject to their exclusive control.

4. Mrs. Butler died on May 31, 1962, of diabetic complications apparently unrelated to the fall. Appellee's complaint was in three counts. The first asserted a claim under the Wrongful Death Act, D.C.Code §§ 16–2701 to 16–2703 (1967 ed.), the second a claim under the Survival Act, D.C.Code §§ 12–101 to 12–104 (1967 ed.), and the third a claim by appellee individually for loss of consortium.

At the trial, appellee withdrew the first count and appellants' bid for a directed verdict failed. The jury found for appellee on the second count and for appellants on the third. After the entry of judgment on the verdict, appellants moved unsuccessfully for a judgment *non obstante veredicto* or a new trial.

characterized as "very essential." In that space the nurse wrote "diabetes with complications" or "diabetic complications," omitting further reference to the symptoms recorded on the chart.[5]

On March 26, Mrs. Butler was moved by wheelchair to the radiological laboratory for the pyelogram. The requisition, but not the chart, accompanied her. She walked to a dressing room, donned a gown and walked to an X-ray table. With the assistance of a student X-ray technician, she stretched horizontally on the table, and the technician made the first picture. Shortly thereafter, a resident radiologist injected the dye substance into a vein in her arm. The technician, continuing the procedures with Mrs. Butler lying supine on the table, made a series of X-rays, the process consuming 20 to 30 minutes.

The technician then requested Mrs. Butler to slide toward the bottom end of the table and rest her feet on a footboard there, explaining that the table would be turned upright. Asked if she could stand, Mrs. Butler replied that she could, and the turning began. Halfway through the maneuver the technician stopped the table and again inquired whether Mrs. Butler was all right and could stand; again the response was in the affirmative.[6] The technician then completed the rotation to a vertical position and, leaving Mrs. Butler standing without any sort of artificial support, went behind the radiation shield to take the next picture. At that point, Mrs. Butler toppled forward, striking her face against equipment on the floor, and fracturing her left cheekbone.

The development of the proof at trial was somewhat a departure from the more usual pattern involving the use of experts to delineate the duties owed by hospitals and radiologists to their patients and to opinionate as to whether they were honored.[7] The mechanical steps in the pyelogram procedure, including the upright X-ray, were competently shown, as was the fact that dizziness is sometimes but not always a by-product of a diabetic condition. But neither side adduced evidence relative to the existence or efficacy of medical practice in the community regarding the kind of information inserted in radiology requisitions or the precautions taken before vertical irradiation is attempted.

Moreover, the liability issues were submitted for the jury's decision on a legal theory atypical of malpractice suits. The trial judge charged in substance that the hospital was accountable for a negligent omission from the requisition of data contained in the chart, and the radiologists for a negligent failure to protect the patient, if a proximate cause of the fall and the patient did not contribute to it. But the jury also was told that for purposes of ascertaining whether there was negligence, all parties' conduct was to be measured by what a reasonable person of ordinary prudence would have done under the same circumstances.[8]

5. This undisputed fact was established testimonially, the form being unavailable at trial.

6. The testimony indicates that vertical X-rays are normally cancelled if the patient's ability to stand is in question, and that the technician checks with the physician in charge if the patient expresses inability to do so.

7. See the cases cited *infra* notes 10–13.

8. The charge included the following:
"[The appellants] are not insurers of their patients against injury, but are only required to use ordinary, reasonable care and diligence in the treatment and care of their patients. The degree of care should be in proportion to the needs of the patient under all of the facts and circumstances.

\* \* \* \* \* \* \*

"Negligence is the doing of some act which a reasonably prudent person, under the same circumstances, would not do; or the failure to do something which a reasonably prudent person would do, under the same circumstances, activated by those considerations which ordinarily regulate the conduct of human affairs.

\* \* \* \* \* \* \*

"You will note that the person whose conduct is set up as a standard is not some exceptional person. It is not a person peculiarly endowed with quali-

Appellants complain that the jury should not have been authorized to assess fault by application of the test these instructions supplied. They also urge that expert testimony was necessary to establish any responsibility and any breach for which they might be charged. We disagree, and we affirm.

With but few exceptions, none relevant here, society demands that everyone under a duty to use care observe minimally a general standard. Familiarly expressed judicially, the yardstick is that degree of care which a reasonably prudent person would have exercised under the same or similar circumstances.[9] Beyond this, the law requires those engaging in activities requiring unique knowledge and ability to give a performance commensurate with the undertaking.

We have verbalized, in terms of the skill and care customary in the community, the special noncontractual standards which hospitals,[10] physicians[11] and radiologists[12] must observe.

Thus it is that expert testimony is usually essential in medical malpractice cases.[13] With lay jurors unlearned and inexperienced in matters of medical science and technique, there must, when the special tests are to be applied, be explanation in order that they may intelligently determine what the criterion is and whether the defendant's conduct meets it. And it goes without saying that when liability is to be gauged by special rules, juries must be properly instructed accordingly. We recognize fully these principles and the supporting con-

---

ties of perfection or an exceptionally skillful person, but it is a person of reasonable and ordinary prudence.

\* \* \* \* \* \* \*

"Therefore, in order to arrive at a fair standard, we ask: What conduct might have been expected of a person of ordinary prudence under the same circumstances?"

9. Parrot v. Wells, Fargo & Co., 82 U.S. (15 Wall.) 524, 536, 21 L.Ed. 206 (1873); McGettigan v. National Bank of Washington, 115 U.S.App.D.C. 384, 386, 320 F.2d 703, 705, cert. denied 375 U.S. 943, 84 S.Ct. 348, 11 L.Ed.2d 273 (1963); Richardson v. Gregory, 108 U.S.App.D.C. 263, 266, 281 F.2d 626, 629 (1960); Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 776 (2d Cir.), cert. denied 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed. 2d 70 (1966).

10. A hospital's duty is "measured by the degree of care, skill and diligence customarily exercised by hospitals generally in the community \* \* \*." Garfield Memorial Hosp. v. Marshall, 92 U.S.App. D.C. 234, 239, 204 F.2d 721, 725, 37 A.L. R.2d 1270 (1953). See also Alden v. Providence Hosp., 127 U.S.App.D.C. ——, 382 F.2d 163 at 166 (July 7, 1967).

11. A physician must exercise "that degree of care and skill ordinarily exercised by the profession in his own or similar localities." Rodgers v. Lawson, 83 U.S.App. D.C. 281, 282, 170 F.2d 157, 158 (1948). See also Brown v. Keaveny, 117 U.S.App. D.C. 117, 118, 326 F.2d 660, 661 (1963);

Quick v. Thurston, 110 U.S.App.D.C. 169, 171, 290 F.2d 360, 362, 88 A.L.R.2d 299 (en banc 1961); Hohenthal v. Smith, 72 App.D.C. 343, 346, 114 F.2d 494, 497 (1940).

12. The standard for radiologists is essentially the same as for physicians. Christie v. Callahan, 75 U.S.App.D.C. 133, 136, 124 F.2d 825, 828 (1941); Hazen v. Mullen, 59 App.D.C. 3, 5, 32 F.2d 394, 396 (1929); Sweeney v. Erving, 35 App. D.C. 57, 61, 43 L.R.A.,N.S. 734 (1910), aff'd 228 U.S. 233, 33 S.Ct. 416, 57 L. Ed. 815 (1913). See also Grubb v. Groover, 62 App.D.C. 305, 67 F.2d 511 (1933), cert. denied 291 U.S. 660, 54 S.Ct. 377, 78 L.Ed. 1052 (1934).

13. See Brown v. Keaveny, *supra* note 11, quoted in the text related to note 18, *infra;* Rodgers v. Lawson, *supra* note 11, 83 US.App.D.C. at 284–285, 170 F.2d at 160–161 ("a question of the merits of a diagnosis and scientific treatment"); Byrom v. Eastern Dispensary & Cas. Hosp., 78 U.S.App.D.C. 42, 43, 136 F.2d 278, 279 (1943) ("as to what constitutes the proper method of treatment of a serious bone injury"); Christie v. Callahan, *supra* note 12, 75 U.S.App.D.C. at 136, 124 F.2d at 828 ("[g]enerally the [special] standard must be shown by experts and so must the departure from it"); Carson v. Jackson, 52 App.D.C. 51, 55, 281 F. 411, 415 (1922) ("whether or not the defendant's treatment of the plaintiff satisfied the standards of care observed by surgeons of ordinary skill in the District").

siderations, and we reemphasize our adherence to them.

■■ There are, however, occasions upon which the acts or omissions of medical professionals can be found to fall below even the standard of reasonably prudent care.[14] In that event, there is no reason, certainly if the plaintiff assents,[15] why the rights and liabilities of the parties cannot be adjudicated through an application of that standard to the evidence.[16] Nor is there peculiar need for expert testimony on any issue the resolution of which would not extend the jury beyond the range of ordinary lay knowledge and experience. Even where the special medical standard is invoked as the touchstone of liability, "the proposition that experts alone are qualified to testify as to the manner of treatment of a patient is 'sound only when soundly applied,'" and " 'there must be, in the nature of things, many instances where the facts alone prove the negligence, and where it is unnecessary to have the opinions of persons skillful in the particular science to show unskillful and negligent treatment.' " [17] And we have differentiated situations "where the question turns on the merits and the performance of scientific treatment," so that "the issue may not be resolved by the jury without the aid of expert opinion," [18] from "an ordinary case of negligence, where the jury is able to solve the question by applying thereto their own experiences" and "the test is: How would a reasonably prudent man have acted under the circumstances? " [19]

■ We consider the case at bar, while slightly hybrid, to be fully amenable to utilization of these principles. The testimony of experts was not indispensable to sagacious resolution of the great bulk of the factual questions, and in the few instances where it was essential it

14. Louie v. Chinese Hosp. Ass'n, Cal.App., 57 Cal.Rptr. 906, 912–918 (1967) (failure of nurses to inform doctor of change in patient's condition); Larrimore v. Homeopathic Hosp. Ass'n, 4 Storey 449, 54 Del. 449, 181 A.2d 573, 576–577 (1962) (failure of nurse to read all of physician's instructions before giving injection); Lipman v. Lustig, 346 Mass. 182, 190 N.E.2d 675, 676 (1963) (dental instrument swallowed by patient); Sanzari v. Rosenfeld, 34 N.J. 128, 167 A.2d 625, 632–633 (1961) (failure to determine whether patient had high blood pressure before injecting form of adrenalin); Becker v. Eisenstodt, 60 N.J.Super. 240, 158 A.2d 706, 709–710 (App.Div.1960) (use of caustic solution on patient's nose) ; Smith v. Yohe, 412 Pa. 94, 194 A.2d 167, 170–174 (1963) (failure to take X-ray of elderly man's hip after fall).

15. The plaintiff gains no advantage, and may possibly incur some disadvantage, by doing so. The special medical standards are but adaptations of the general standard to a group who are required to act as reasonable men possessing their medical talents presumably would.

16. See cases cited *infra* notes 17–19.

17. Byrom v. Eastern Dispensary & Cas. Hosp., *supra* note 13, 78 U.S.App.D.C. at 43, 136 F.2d at 279, quoting Cornwell v. Sleicher, 119 Wash. 573, 205 P. 1059, 1061 (1922). Expert testimony was held to be unnecessary in Young v. Fishback, 104 U.S.App.D.C. 372, 373, 262 F.2d 469, 470 (1958) (small bit of gauze left in surgical incision); Goodwin v. Hertzberg, 91 U.S.App.D.C. 385, 386, 201 F.2d 204, 205 (1952) (perforation of patient's urethra during operation); Byrom v. Eastern Dispensary & Cas. Hosp., *supra* (failure to correct obvious bone protrusion and misalignment after removal of cast from fractured wrist); Grubb v. Groover, *supra* note 12, 62 App.D.C. at 306, 67 F.2d at 512 (X-ray burns when radiologist left patient alone). The essence of these holdings derives from the circumstance that an informed judgment on the reasonableness of the conduct did not depend upon expertise. Rodgers v. Lawson, *supra* note 11, 83 U.S.App.D.C. at 264–265, 170 F.2d at 160–161. See, stating the principle under consideration, Garfield Memorial Hosp. v. Marshall, *supra* note 10, 92 U.S.App.D.C. at 240, 204 F.2d at 726–727; Christie v. Callahan, *supra* note 12, 75 U.S.App.D.C. at 136, 124 F.2d at 828; Crist v. White, 62 App.D.C. 269, 270–271, 66 F.2d 795, 796–797 (1933); Sweeney v. Erving, *supra* note 12, 35 App.D.C. at 62.

18. Brown v. Keaveny, *supra* note 11, 117 U.S.App.D.C. at 118, 326 F.2d at 661.

19. Carson v. Jackson, *supra* note 13, 52 App.D.C. at 55, 281 F. at 415.

was supplied. With the technical aspects of the controversy thus elucidated, the jury's ultimate determinations could be fashioned on the basis of what in similar circumstances reasonably prudent men would have done.[20]

The jury could have found that the hospital contributed to Mrs. Butler's tumble by failing to adequately inform the radiologists of the facts contained in its records suggesting a proneness to black out. While its nurse did insert in the requisition "diabetes with complications" or "diabetic complications", a notation the significance of which laymen would not be expected to comprehend on their own, the jury was at liberty to resort to the uncontradicted expert view expressed at trial that not all, but only some, diabetics are predisposed to loss of consciousness. Since the requisition at most communicated to the radiologists the fact that as a diabetic Mrs. Butler might or might not be so affected, while the chart contained data denoting plainly that she was, the jury could properly conclude that a reasonably prudent person would have been more specific than the hospital,[21] and that had it been the fall might not have occurred.[22]

The jury might appropriately have pursued a similar course in evaluating the conduct of the radiologists. They were on notice not only that Mrs. Butler was a diabetic but also that there were associated complications, and they should have been aware of the medical fact that some diabetics are unsteady afoot. Yet they conducted no examination of the patient on their own, and made no inquiry of the hospital or the attending physician for further information.[23] And there was testimony, given by experts, that anyone—even a normal person, and less dubitably a sick person— might become dizzy on rotation from a supine to an upright position. The jury was free to find that a reasonably prudent person would not have left Mrs. Butler standing alone without adequate safeguards against a fall.

This decisional route, then, was amply warranted by the evidence. To sustain appellee's burden,[24] it had to be "substantial, more than a scintilla, such as reasonable men might believe," [25] but in our

---

20. We have recognized that "ordinary care" may necessitate "unusual precautions," even by laymen, to protect "infirm, sick and injured persons." McKay v. Parkwood Owners, Inc., 78 U.S. App.D.C. 260, 139 F.2d 385 (1943).

21. In Sweeney v. Erving, *supra* note 12, 35 App.D.C. at 64, we said that a radiologist to whom a surgeon had referred a patient for X-ray diagnosis of a fracture, "in the absence of anything warranting a contrary conclusion was justified in relying upon the judgment of the surgeon" as to the patient's physical agreeability to the procedure. Here, however, the patient's attending physician particularized in the hospital's records the fact that she was weak and apt to become dizzy.

22. See *infra* note 26.

23. Compare Favalora v. Aetna Cas. & Sur. Co., 144 So.2d 544, 552 (La.App.), cert. denied by La.Sup.Ct. (1962), a case strikingly similar to the one at bar.

24. See Quick v. Thurston, *supra* note 11, 110 U.S.App.D.C. at 171, 290 F.2d at

362; Rodgers v. Lawson, *supra* note 11, 83 U.S.App.D.C. at 282, 170 F.2d at 158; Hohenthal v. Smith, *supra* note 11, 72 App.D.C. at 346, 114 F.2d at 497; Sweeney v. Erving, *supra* note 12, 35 App. D.C. at 62.

25. Christie v. Callahan, *supra* note 12, 75 U.S.App.D.C. at 135, 124 F.2d at 827. In this case we delineated the principle by which the sufficiency of the evidence to support a verdict is determined. We said:

"The question arises in two phases, causation and negligence. Our function is not to weigh the evidence factually as the jury does. It is to decide whether plaintiff's case, as made, was strong enough for us to allow the jury to consider it. To do this we must apply some standard. But we cannot weigh plaintiff's case against defendants'. Less than preponderance is sufficient. How much less is hard to state abstractly. Commonly the case weighed, to stand, is required to be substantial, more than a scintilla, such as a reasonable man might believe. All these are just different ways of saying that less than preponderance

view it was sufficient.[26] We deem it the more so when it is recalled that appellee was litigating in an area where proof of carelessness may be hard to come by.[27] And, rejecting additional contentions advanced by appellants,[28] we hold that the

is required, but the evidence should not be so thin that it would be dangerous for the jury to consider it.

"The danger to be guarded against is a too obvious and gross miscarriage of justice, a departure too far from established lines of liability. Facts are primarily within the jury's function. Hence it must be given wide latitude, or trial by jury becomes trial by court. But the jury is not absolute in the realm of fact. Like judges, jurors have weaknesses of emotion and judgment. Unlike judges, they seldom have a background of decision experience against which to check them. Our tradition supplies this through judicial controls. Exclusion of evidence is one. When one side's case is thin, determining its 'legal sufficiency' is another. This really means weighing it factually, not for conviction, but for doubt as to the outcome. The verdict sustained therefore represents the jurors' conviction that it is right, and the judge's that it may be right.

"The boundary between substance and shadow is hard to draw. Men, including judges, differ about it, always in concrete cases. What is substance to one may be shadow to another. The line cannot be drawn by magic of word or formula. It is not susceptible of generalization. It is always relevant to the issues and the evidence in a particular case. Hence, in the end, a kind of intuitive evaluation must be made, that the verdict does not or would not shock the judicial sense of justice." (75 U.S.App.D.C. at 134–135, 124 F.2d at 826–827).

26. This is our conclusion not only as to the findings of negligence but those as to causation as well. Mrs. Butler's personal physician testified that the fall could have been occasioned by (a) failing vision, (b) diseased legs, (c) weakness or dizziness related to mild anemia, or (d) dizziness upon movement from a horizontal to a vertical position. To this we may add the possibility of a voluntary movement by the patient. The physician did not equate the possibilities, and was unable to identify the actual cause here. As appellants argue, a defendant's liability is not established by evidence denoting equally probable causes of injury for one or more of which a defendant is not responsible. Kasmer v. Sternal, 83 U.S. App.D.C. 50, 52, 165 F.2d 624, 626

(1948). But "[t]he law is not so exacting that it requires proof of negligence or causation by testimony so clear that it excludes every other speculative theory." Christie v. Callahan, supra note 12, 75 U.S.App.D.C. at 148, 124 F.2d at 840. See also the cases collected in Annot., 13 A.L.R.2d 11, 24–31 (1950). We think the jury could legitimately find on a fair preponderance of the evidence a reasonable probability that the hospital's omission of data on the requisition and the radiologists' handling of the patient in the laboratory concurred proximately in causing the fall. See also infra note 29.

27. "Malpractice is hard to prove. The physician has all of the advantage of position. He is, presumably, an expert. The patient is a layman. The physician knows what is done and what is its significance. The patient may or may not know what is done. He seldom knows its significance. He judges chiefly by results. The physician has the patient in his confidence, disarmed against suspicion. Physicians like lawyers, are loath to testify a fellow craftsman has been negligent, especially when he is highly reputable in professional character, as are these defendants. In short, the physician has the advantage of knowledge and of proof. This increases when he is a specialist. What therefore might be slight evidence when there is no such advantage, as in ordinary negligence cases, takes on greater weight in malpractice suits." Christie v. Callahan, supra note 12, 75 U.S.App.D.C. at 135–136, 124 F.2d at 827–828. See also Goodwin v. Hertzberg, supra note 17, 91 U.S.App.D.C. at 386, 201 F.2d at 205.

28. Since the jury might have found that appellee suffered no loss of consortium beyond what his wife's diabetic condition and resulting hospitalization had already occasioned, we cannot say that the verdict for him as her administrator and against him as her husband was inconsistent.

Nor, considering the nature and consequences of Mrs. Butler's physical injuries, do we consider the $6,000 awarded as damages so "grossly excessive or monstrous," Hulett v. Brinson, 97 U.S. App.D.C. 139, 142, 229 F.2d 22, 25 (1955), cert. denied 350 U.S. 1014, 76 S.Ct. 659, 100 L.Ed. 874 (1956), as to require reversal. See also Haycock v.

jury's disposition of the controversy must stand as to each.[29]

■ We are mindful of the fact that throughout the pretrial stages of the case both appellants asserted defensively that their actions accorded with acceptable medical practice in this locality. However, as we have stated, nothing was introduced on that subject at the trial.[30] With a prima facie showing that each appellant failed to exercise ordinary care, it was incumbent upon them to go forward with evidence on that score. By this we mean that medical custom may have possessed evidentiary value, and not that conformity with it would necessarily have absolved appellants from liability.[31] Medical procedures involving the phe-

Christie, 101 U.S.App.D.C. 409, 410, 249 F.2d 501, 502 (1957); Rankin v. Shayne Bros., 98 U.S.App.D.C. 214, 216–217, 234 F.2d 35, 37–38 (1956); Behrman v. Sims, 81 U.S.App.D.C. 303, 305, 157 F.2d 862, 864 (1946).

29. Injury consequent upon the concurring negligence of two or more persons subjects each to liability. Danzansky v. Zimbolist, 70 App.D.C. 234, 235–236, 105 F.2d 457, 458–459 (1939); Campbell v. District of Columbia, 64 App.D.C. 375, 376–377, 78 F.2d 725, 726–727 (1935); Metropolitan R. R. v. Jones, 1 App.D.C. 200, 205 (1893); McSparran v. Hanigan, 225 F.Supp. 628, 631–639 (E.D.Pa.1963), aff'd sub nom. McSparran v. Subers, 356 F.2d 983 (3d Cir. 1966); Corey v. Havener, 182 Mass. 250, 65 N.E. 69 (1902). " 'It is no defense for a wrongdoer that a third party shared the guilt of the same wrongful act, nor can he escape liability for the damages he has caused on the ground that the wrongful act of a third party contributed to the injury.' " Miller v. Union Pac. R. R., 290 U.S. 227, 236, 54 S.Ct. 172, 174, 78 L.Ed. 285 (1933), quoting Choctaw, O. & G. R. R. v. Holloway, 114 F. 458, 462 (8th Cir. 1902), aff'd 191 U.S. 334, 24 S.Ct. 102, 48 L.Ed. 207 (1903).

30. The closest evidentiary item we find in the record is the affirmative answer of one of the appellant radiologists to a question whether "[w]ith respect to the *procedures for bringing patients to X-ray for intravenous pyelogram,* the procedure followed at the Washington Hospital Center in March 1962 was substantially the same as procedures with which you were aware in other hospitals." [Emphasis supplied]. Quite obviously that testimony, particularly when viewed contextually, had no tendency to establish custom respecting the pyelogram procedures themselves.

The radiologist also expressed his opinion as to what would justify a decision to proceed with the standing phase of the pyelogram. This, too, falls short of the mark. Carson v. Jackson, *supra* note 13, 52 App.D.C. at 57–58, 281 F. at 417–418. See also Hazen v. Mullen, *supra* note 12, 59 App.D.C. at 5, 32 F. 2d at 396.

31. In Byrom v. Eastern Dispensary & Cas. Hosp., *supra* note 13, the trial court had instructed the jury that if it found "from the testimony of the experts in this case that the treatment and conduct of" the defendant physician "was in keeping with good and approved practice among physicians of like qualifications and experience in the District of Columbia at that time, then your verdict must be for the defendant." We held that this instruction was erroneous because "[i]t in effect told the jury to ignore all of the evidence in the case save that of the doctors who testified as experts, and to find for appellees if the treatment administered by" the defendant physician "squared with District of Columbia practice." (78 U.S.App.D.C. at 43, 136 F.2d at 279).

Similarly, in Garfield Memorial Hosp. v. Marshall, *supra* note 10, where despite abundant indicia of negligence physicians testified in effect that "the hospital's physicians and nurses acted in accordance with good and accepted standards of hospital service in the District of Columbia at that time," we said that "[t]he jury did not, and was not required to, accept this somewhat startling statement" and that "non-expert evidence of conditions and results may be accepted on the question of negligence". (92 U.S.App.D.C. at 240, 204 F.2d at 726).

See also the cases cited *supra* notes 14, 17–19.

nomena of everyday lay experience are not immune from a community judgment, made on an informed basis, as to their

virtue in terms of what bodily safety minimally entails.[32]

Affirmed.

**32.** "[U]sual and customary methods generally employed by physicians and surgeons and the diagnosis, care and treatment of a patient, no matter how long such methods have continued to be employed, cannot avail to prove and establish as safe in law methods and conduct which are in fact negligent." Morgan v. Sheppard, 188 N.E.2d 808, 816–817 (Ohio App.1963). See also Leonard v. Watsonville Community Hosp., 47 Cal.2d 509, 305 P.2d 36, 42 (1956) (failure to make instrument count); Ales v. Ryan, 8 Cal. 2d 82, 64 P.2d 409, 418 (1936) (reliance on nurses' sponge count); Favalora v. Aetna Cas. & Sur. Co., *supra* note 23 (failure to obtain clinical history before taking X-rays); Ault v. Hall, 119 Ohio St. 422, 164 N.E. 518, 60 A.L.R. 128 (1928) (reliance on nurse's sponge count); Johnson v. Ely, 30 Tenn.App. 294, 205 S.W.2d 759, 764, cert. denied by Tenn.Sup.Ct. (1947) (failure to make needle count). And see the cases cited *supra* notes 14, 17–19.