Roy C. HAVEN, Jr., a minor by his next
friend, et al., Appellants,

v.

Judson G. RANDOLPH, M.D., et al.,
Appellees.

No. 72–1891.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 30, 1973.

Decided Feb. 27, 1974.

Van Pelt, Senior District Judge,
filed a dissenting opinion.

Leonard Joseph Keilp, Washington, D.
C., for appellants.

Paul M. Hyman, Washington, D. C.,
with whom Perry S. Patterson, Wash-
ington, D. C., was on the brief, for ap-
pellee, Randolph.

Frank J. Martell, Washington, D. C.,
with whom Richard W. Galiher, William
H. Clarke and William J. Donnelly, Jr.,
Washington, D. C., were on the brief,
for appellee, Coleman.

Denver Graham, Washington, D. C., with whom Albert E. Brault, Washington, D. C., was on the brief, for appellee, Children's Hospital of the District of Columbia.

Before ROBB and WILKEY, Circuit Judges, and VAN PELT,* United States Senior District Judge for the District of Nebraska.

PER CURIAM.

We affirm the judgment below directing a verdict in favor of all defendants on both counts of the plaintiffs' complaint. We rely primarily on the findings and reasoning set out in District Judge Flannery's opinion, reported as Haven v. Randolph, 342 F.Supp. 538 (D.D.C.1972).

However, in his dissent Judge Van Pelt raises a question to which we should respond specifically. He believes that the jury could have reasonably inferred from the evidence produced at trial, particularly the testimony of Dr. Randolph himself, that Dr. Randolph had violated the applicable standard of care in administering the Hypaque dye to Roy Haven. We think that the trial court acted properly when it precluded the jury's consideration of such an inference by directing a verdict.

■ In Kosberg v. Washington Hospital Center, 129 U.S.App.D.C. 322, 394 F.2d 947 (1968), we stated: "A *prima facie* case of medical malpractice must normally consist of evidence which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of." 129 U.S.App.D.C. at 324, 394 F.2d at 949. The trial court concluded in this case that the plaintiffs had failed to clear the first hurdle of establishing the standard of care. The court stated: "[P]laintiffs offered no expert medical testimony which might be probative of the standard of care except for the testimony of defendant physicians themselves." 342 F.Supp. at 543. Judge Van Pelt, however, responds that "negligence of a doctor can be shown either by expert testimony indicating that the community standards were not followed by him *or by proven facts or by inferences which by common knowledge may be drawn from the facts.*" Dissenting opinion, *infra,* p. 1072 (emphasis supplied). Allowing a jury to make its own inferences from the proven facts may be permissible when a physician has committed a blunder so egregious that a layman is capable of comprehending its enormity. An example is the case of a surgeon who leaves a sponge in an incision after removal of a kidney. *See* Rodgers v. Lawson, 83 U.S.App.D.C. 281, 284–285, 170 F.2d 157, 160–161 (1948). But where "the question turns on the merits and performance of scientific treatment, the issue may not be resolved by the jury without the aid of expert testimony." Brown v. Keaveney, 117 U.S.App.D.C. 117, 118, 326 F.2d 660, 661 (1963).

■ In this case, Dr. Randolph performed a highly sophisticated transfemoral aortogram, which is the procedure of "injecting radio-opaque media into the renal artery by means of a catheter inserted into the femoral artery through an incision in the thigh near the groin, and moving it upwards to the renal artery, in order to visualize by x-rays the kidneys and surrounding areas." Brief for Appellee Randolph at 5 n. 1. Clearly, in order to establish a standard of care applicable to administration of an aortogram and to demonstrate that Dr. Randolph breached that standard, expert testimony was necessary. None was supplied by plaintiffs in this case.

■ Despite the failure of plaintiffs to establish by expert testimony a standard of care and its breach, Judge Van Pelt argues that a jury could reasonably have inferred negligence from certain segments of Dr. Randolph's testimony. These segments do not expose any fault in Dr. Randolph's physical technique in

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

administering the aortogram. They merely indicate that the doctor may have injected dosages that were hazardous to the patient, Roy Haven. In focusing on these isolated segments of Dr. Randolph's testimony, we think our colleague does not adequately evaluate the doctor's assertions that the hazards he created were necessary in order to treat Roy's death-threatening condition properly. Evaluation of a doctor's conduct in treating a patient requires examination not only of the risks inherent in the doctor's method of treatment, but also of whether running those risks was justified as a prerequisite to correcting the patient's condition.

The passages from Dr. Randolph's testimony cited by Judge Van Pelt demonstrate at most that Dr. Randolph may have taken a substantial risk in administering the aortogram to Roy in the manner he did.[1] True, Dr. Randolph admitted "that the adult dosage was 25 c.c.'s [and] that this dosage was proportioned down for children." Dissenting opinion, *infra*, p. 1072. But he also testified that "drug scaling down becomes a matter of reason, a matter of judgment, a matter of experience." Transcript at 739. Dr. Randolph's reason, judgment, and experience told him that scaling down the dosage for Roy too drastically would have made the amounts injected "unworkable," Transcript at 738,[2] and thus ineffective for the purpose of revealing the location of the stenosis blocking Roy's renal artery. The doctor further stated, "I could not proceed with surgery without demonstration of the artery and the possible blockage . . . ." Transcript at 668. No one has contested the proposition that surgery to correct Roy's stenosis was necessary to save his life. Therefore, Dr. Randolph's testimony was that the risk inherent in injecting 9–10 cc.'s of Hypaque was necessary in order to correct Roy's life-threatening condition.

■■ The doctor also admitted that he administered a total of 19 cc.'s within a period of twenty minutes to Roy, and that such repetition of dosages should "be avoided whenever possible." Transcript at 1133. However, he supplied sound medical reasons for the consecutive dosages:

> Well, my best considered judgment at that time, based on some years of training in children's surgery, based on the specific study of the problem of renal hypertension and aortography in children, told me that the best thing to do was to proceed with the second injection because this boy was under general anesthesia; we knew that any general anesthesia was a threat to him; the catheter was in place; there was already some hazard to the renal artery—excuse me—to his femoral artery, which is the site of the operation to put the catheter; and to try to double all of that in the face of the body of information, which was that no child had ever been parlyzed [sic] by this procedure before under the age of nine, seemed to me, in my judgment, a much better decision for the boy.

Transcript at 669. Only an expert could determine whether Dr. Randolph's exercise of medical judgment in this case measured up to the standard of care for physicians in the community. This is manifestly not a case in which the jury should have been allowed to infer negligence from admissions that the treatment methods employed involved some hazard to the patient.

Affirmed.

---

1. There is some doubt about the magnitude of the risk since Roy's extreme reaction to the Hypaque injection was apparently the first recorded instance of such a reaction to aortography in a child under nine years of age. Transcript at 651, 1094 (testimony of Dr. Randolph).

2. Dr. Randolph asserted that in his experience the 9–10 cc. dosage that he administered to Roy during each test represented the "upper limits of *safe* dosage." Transcript at 1130 (emphasis supplied).

**1072**

VAN PELT, Senior District Judge, dissenting:

I have no serious problem in affirming the directed verdict in favor of the hospital and Dr. Coleman. My dissent is based upon my conclusion that the case should have been submitted to a jury as to the negligence of Dr. Randolph.

A brief statement as to the legal principles involved is appropriate. It is clear that a doctor does not guarantee results. However, negligence of a doctor can be shown either by expert testimony indicating that the community standards were not followed by him or by proven facts or by inferences which by common knowledge may be drawn from the facts. The calling of a medical expert is unnecessary where the facts prove negligence, or where you can infer negligence from the proven facts. *See, e. g.,* Hill v. Gonzalez, 454 F.2d 1201 (8th Cir. 1972). In Wilkerson v. McCarthy, 336 U.S. 53, 57, 69 S.Ct. 413, 415, 93 L.Ed. 497 (1949), the Court said, "that in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of a litigant against whom a peremptory instruction has been given."

With this in mind, I turn to the evidence. Roy C. Haven was a child of two and one-half years at the time of the procedure performed by Dr. Randolph on May 21, 1964. The procedure was an aortogram in which a solution of Hypaque was injected. The specific procedure is known as a trans-femoral retrograde aortogram. The transcript shows that a retrograde aortogram means essentially a trans-femoral retrograde aortogram (T. 534). Following the aortogram the boy was discovered to have paraplegia or paralysis from the level of about T–10, thoracic vertebra 10, down (T. 553). Dr. Randolph testified that there was no question in his mind that the paraplegia was caused because of the aortogram (T. 622) and that it

was fair to say that the spinal cord was traumatized somehow. The paraplegia was noted about four hours after the aortogram (T. 624).

The history shows that on May 9 the boy was given Hypaque in an amount of 10 cc.'s administered through a wrist vein. On May 20 he was given an intravenous injection of 10 cc.'s of Hypaque. On May 21 he was given an injection several times referred to as 10 cc.'s in one steady squeeze. Dr. Randolph said as to the amount "make that 9 cc.'s." (T. 664) A second injection was given of 10 cc.'s fifteen to twenty minutes later (T. 665) so that he received 19 cc.'s of Hypaque within twenty minutes (T. 666). Dr. Randolph testified that it was "important when you get a child—the difference between 9 and 10 and 8" (T. 664) and that he wanted to be careful whether he gave 9, or 10, or 8 (T. 665). He agreed that an aortography was a hazardous procedure. He agreed that the hazard was increased when you have an asthmatic, allergic child of two and a half years with high blood pressure, and it was increased even more when you give 19 cc.'s within a period of 20 minutes (T. 666, 667).

The testimony is not consistent as to whether the manufacturer's recommendations were known to the Doctor on May 21 or followed. He did say that he was familiar with the inserts that the company had at the time and had read them (T. 726). He also testified that he had seen literature relative to aortography and that you proportion the injection down for children. This was true whether it was a trans-lumbar or a tranfemoral aortography (T. 749–754). He testified that he scaled it down from 25 cc.'s to 9 cc.'s, that 25 cc.'s was the adult dosage and that 9 cc.'s was a child's dosage (T. 728). He also testified that you generally try to give less in an artery than in a vein (T. 653, 654) and in this case that he twice gave the same amount in the artery that he would give in the vein (T. 653).

Dr. Randolph having admitted: 1) that the adult dosage was 25 cc.'s; 2)

that this dosage was proportioned down for children; 3) that he administered a total of 19 cc.'s within a period of twenty minutes to a two and a half year old child; and 4) that the aortogram caused the paraplegia, I conclude that without other expert medical testimony that the evidence was sufficient for the jury to infer negligence from these proven facts.

Consequently, I conclude that the trial court should have submitted to the jury the question of whether Dr. Randolph was negligent in using Hypaque in excessive and repeated injections in this two and a half year old boy.

Under the circumstances of the offers as made I find no error in the failure to receive in evidence certain depositions. Portions of these were admissible had the relevant portions only been offered. The trial judge was correct in denying the "scoop shovel" approach.