**Ed CARLSEN, Special Administrator of the Estate of Donna Marie Carlsen, Deceased, Appellant.**

v.

**A. J. JAVUREK, M. D., et al., Appellees.**

**No. 75–1023.**

United States Court of Appeals, Eighth Circuit.

Submitted June 10, 1975.

Decided Nov. 7, 1975.

Rehearing Denied Dec. 19, 1975.

Franklin J. Wallahan, Rapid City, S. D., for appellant.

William G. Porter, Rapid City, S. D., for appellees A. J. Javurek and Rueben Trinidad.

Thomas E. Simmons, Rapid City, S. D., for appellee C. F. Johnson.

Curtis D. Ireland, Rapid City, S. D., for appellee Abbott Laboratories.

Before GIBSON, Chief Judge, BRIGHT, Circuit Judge, and KILKEN-NY, Senior Circuit Judge.[*]

BRIGHT, Circuit Judge.

Donna Marie Carlsen underwent surgery at St. Joseph's Hospital in Deadwood, South Dakota, on January 5, 1972, for an elective cholecystectomy (gall bladder removal).[1] The surgery was performed under Penthrane (Methoxyflurane), a general halogenated anesthetic.[2] Subsequent to surgery, Mrs. Carlsen developed a liver dysfunction which resulted in her death on January 17, 1972. Her husband, Ed Carlsen, as special administrator of Mrs. Carlsen's estate, subsequently brought this suit for wrongful death alleging negligence on the part of the appellees relating to the selection and administration of Penthrane during the operation which proximately caused Mrs. Carlsen's fatal illness. Carlsen sought damages for himself as surviving husband, for the estate, and for his four children against the attending physician and assisting surgeon, Dr. A. J. Javurek; the operating surgeon, Dr. Rueben Trinidad; the nurse-anesthetist, Carol F. Johnson, and her employer, St. Joseph's Hospital; and Abbott Laboratories, the manufacturer of Penthrane. The trial court directed a verdict in favor of Abbott Laboratories and the jury dismissed the action against the other defendants. Carlsen then brought this timely appeal from the judgment of dismissal.

After a thorough review of the record, we sustain the directed verdict and judgment dismissing Abbott Laboratories and the dismissal against Dr. Javurek, but reverse the judgment otherwise and direct that plaintiff be given a new trial against surgeon Trinidad, nurse Johnson, and her employer, St. Joseph's Hospital.

---

[*] JOHN F. KILKENNY, Senior Circuit Judge, Ninth Circuit, sitting by designation.

1. Mrs. Carlsen was 26 years old at the time of surgery and in reasonably good health.

2. All halogenated anesthetics contain halogens which are a group of elements consisting primarily of fluorine and bromine.

Although the trial lasted over a period of eight days, the salient testimony bearing on liability is not unduly extensive nor complicated and we summarize it below.

## I. *Factual Background.*

Donna Marie Carlsen entered St. Joseph's Hospital for surgery on January 3, 1972, under the care of her physician, Dr. Javurek, a general practitioner in Deadwood, South Dakota. She had earlier complained of chronic epigastric distress which Dr. Javurek had determined was resulting from a malfunctioning gall bladder. Dr. Javurek called in Dr. Rueben Trinidad, a general surgeon practicing in the Lead-Deadwood-Spearfish, South Dakota, area, to perform the cholecystectomy. The admitting hospital history disclosed, among other things, that Mrs. Carlsen had suffered from hepatitis in 1956, during childhood.

Dr. Trinidad testified that he visited with Mrs. Carlsen on the day before surgery and advised her that she would be given a general anesthesia. He informed her of the risks of surgery under a general anesthetic, including the risk of death. He further told Mrs. Carlsen that tests taken at the hospital showed her physical condition as generally normal but that because of her history of hepatitis there were "anesthetics that we probably would not be using."

Dr. Trinidad testified he was aware that there were two schools of thought in the medical profession concerning the propriety of administering a halogenated anesthetic such as Penthrane to patients with a prior history of hepatitis; one school believing it is "absolutely o. k. to use" a halogenated anesthetic and the other school believing that "you may [want to] choose a different anesthetic." In essence, Dr. Trinidad stated that he made a medical decision not to use Penthrane as an anesthesia in the surgery and communicated that decision to nurse Johnson.

Dr. Trinidad testified that he specifically told nurse Johnson not to use a halogenated anesthetic. At another point in his testimony he stated that while the nurse-anesthetist normally chose the anesthetic to be used, it was the "custom" in the hospital for the nurse-anesthetist to follow any direct orders from the surgeon. He added that he "assumed that she [nurse Johnson] would make a decision of her own considering my discussion, taking into consideration my suggestion, her knowledge of the patient, her knowledge with what the operation is going to be." [3]

Nurse Johnson admitted that she was obligated to follow a physician's direct order relating to an anesthetic but in this case she specifically denied having any conversation with Dr. Trinidad prior to surgery and denied that Dr. Trinidad told her not to use a halogenated anesthetic. She stated that prior to surgery, she informed Dr. Javurek of her choice of anesthetic and that he merely raised his eyebrows and shrugged his shoulders. Dr. Javurek, however, denied this exchange. Dr. Javurek assisted in the surgery but testified that he did not participate in the selection of the anesthesia administered to Mrs. Carlsen. The testimony indicates that prior to the operation Dr. Javurek advised the circulating nurse to remind nurse Johnson of Mrs. Carlsen's prior history of hepatitis.

The defendants presented an anesthesiologist, Dr. Michael Weingarten, director of the Department of Anesthesia at St. Francis Hospital in Milwaukee, Wisconsin, as an expert witness and introduced a report into evidence entitled the "National Halothane Study" to support the proposition that notwithstanding Mrs. Carlsen's prior history of hepatitis 16 years earlier, Penthrane was the proper anesthetic for the operation. [4]

---

**3.** Dr. Trinidad testified that he did not learn of the administration of Penthrane until several days after the surgery when Mrs. Carlsen became acutely ill.

**4.** Dr. Weingarten gave his opinion that under the circumstances, Penthrane was the best anesthetic which could have been used.

The package insert accompanying Penthrane contained the following relevant warnings:

PRECAUTIONS:

Cirrhosis, *a history of viral hepatitis* or other abnormalities involving liver dysfunction may be the basis for selecting an anesthetic other than a halogenated agent * * *.

ADVERSE REACTIONS:

Hepatic dysfunction and fatal hepatic necrosis following Penthrane (Methoxyflurane) anesthesia have been reported * * *. (Emphasis added).

Dr. William K. Hamilton, chairman of the Department of Anesthesia at the University of California Medical Center in San Francisco, was deposed by appellees but plaintiff offered his video deposition on rebuttal. He indicated that other anesthetics might have been administered to a patient with a prior history of hepatitis; that the package insert accompanying the anesthesia serves to give the surgeon a choice of anesthesias; and that the surgeon is the "final responsible person" to select the anesthesia.

The parties disputed the cause of death. Her attending physician attributed her acute illness and death as "most probably" due to toxic hepatitis resulting from the anesthetic administered during surgery. Defendant's expert witness testified that Mrs. Carlsen's death was most likely caused by a viral hepatitis which had been in an incubating stage prior to surgery and thus had not been ascertainable through tests administered immediately prior to her operation.

In seeking reversal and a new trial, appellant Carlsen contends that the court erred in (1) directing a verdict in favor of Abbott Laboratories, (2) in giving certain instructions, (3) in failing to submit certain theories of liability against the doctors, nurse, and hospital to the jury, (4) in rulings on evidence made during the course of the trial, and (5) in denying the plaintiff leave to amend his complaint on the eve of trial. Since this is a diversity case, we apply South Dakota substantive law and examine these contentions in light of the case made against each defendant.

II. *Abbott Laboratories and Dr. Javurek.*

Plaintiff contends the warning or package insert (quoted above) which accompanied Penthrane was inadequate to warn of the dangers incident to the use of the drug.

 Plaintiff produced no evidence to establish the insufficiency of this warning. Both of the expert witnesses agreed that the warning on the drug insert was proper and adequate. Indeed, Dr. William K. Hamilton, whose testimony was introduced by the plaintiff, testified that a stronger warning would have been incorrect. Plaintiff offered no evidence to the contrary. Accordingly, based on the testimony in this case, the dismissal of Abbott Laboratories must be sustained.[5]

 As we have noted, Dr. Javurek assisted in the surgery. No evidence indicated that he exercised any control over Dr. Trinidad or participated in the selection of the anesthesia to be administered to Mrs. Carlsen. While nurse-anesthetist Johnson testified that prior to surgery she advised Dr. Javurek of her intention to use Penthrane in the surgery and that he shrugged his shoulders in response, a gesture which she considered to be a signal of partial approval

---

**5.** The plaintiff alleges as error the refusal of the trial court to allow evidence obtained by interrogatory disclosing adverse effects from the use of Penthrane reported by doctors in the field. The court's ruling was error. The knowledge received by a drug company from physicians in the field reporting adverse effects from the use of a drug becomes relevant on the notice received by the drug manufacturer relating to adverse effects following use of the drug. Although this testimony should have been admitted as a preliminary matter, no prejudicial error appears in this case since the plaintiff was not prepared to pursue this issue by offering any expert testimony to support a theory of inadequacy of warning based on these interrogatories or any other evidence.

and partial disapproval, this testimony does not show any participation by Dr. Javurek in the selection of an anesthesia and we can find no evidence of negligent conduct by him in this record. Under these circumstances, plaintiff did not make a case against Dr. Javurek. Any trial errors, as discussed below, do not affect the claim against Dr. Javurek and the dismissal of the action against him must be sustained.

### III. The Case Against Dr. Trinidad, Nurse Johnson, and St. Joseph's Hospital.

The case against nurse Johnson and her hospital employer rests on the Trinidad testimony which supports the theory that nurse Johnson administered Penthrane, a halogenated anesthesia to the patient contrary to a medical decision which Dr. Trinidad communicated to her. As noted, nurse Johnson disputes receiving any such order from Dr. Trinidad.

Fundamentally, this conflict in evidence requires an analysis of the duties of a physician to communicate his medical decision to a nurse and the obligations of a nurse to follow a physician's orders or directions [6] against the backdrop of jury instructions which appellant alleges were erroneous.

With respect to Dr. Trinidad, the court instructed the jury as follows:

> You are instructed that whether or not the injury complained of by plaintiff was the result of the defendant doctors' negligence in failing to use reasonable skill and care in the treatment which they utilized in this case is a question which can *only* be determined by witnesses qualified to speak, and that requirement is fulfilled *only* by *physicians* qualified and acquainted with the method and standard of treatment ordinarily used for the relief of the same or similar conditions. In this case, the defendant doctors'

negligence *cannot* be based upon the testimony of lay witnesses.

> Therefore, in determining whether or not in this case defendants doctors and the treatment given by them is chargeable with failure to possess and use reasonable skill and care in accordance with the standards given to you in these instructions, *you are not* to be governed by opinions of your own as laymen, and *disregard the preponderance of expert evidence in the case.* (Emphasis added).

With respect to the nurse-anesthetist, the court instructed:

> You are instructed that in a medical malpractice case, the negligence of a nurse-anesthetist *must* be established by testimony of medical experts, and this requirement is *fulfilled only by expert witnesses qualified and acquainted with the anesthetics* which are acceptable for use under the same or similar conditions or to accomplish the desired result. Thus, in this case, *negligence* on the part of the defendant, Carol Johnson, *cannot be established upon the testimony of persons who are not medical experts in the field of anesthetics.* (Emphasis added).

Thus, under these instructions, any negligence on the part of Dr. Trinidad in failing to convey any medical decision he made to the nurse-anesthetist could be established only by physician-expert witnesses. Any negligence on the part of nurse Johnson in not following a physician's order could only be established by experts in the field of anesthetics.

■ Ordinarily, of course, negligence in medical malpractice cases must be established by the testimony of medical experts. *See Haven v. Randolph,* 161 U.S.App.D.C. 150, 494 F.2d 1069, 1070–71 (1974); *Bryant v. Rankin,* 468 F.2d 510, 513 (8th Cir. 1972); *O'Brien v. Stover,* 443 F.2d 1013, 1017 (8th Cir. 1971);

---

**6.** We have also noted Dr. Trinidad's testimony that he assumed nurse Johnson would make her decision on the selection of an anesthesia

taking in account his suggestion, but nurse Johnson denied receiving such suggestion.

*Thompson v. Lillehei*, 273 F.2d 376, 383 (8th Cir. 1959). South Dakota follows this general rule. *See Block v. McVay*, 80 S.D. 469, 126 N.W.2d 808, 810 (1964); *Lohr v. Watson*, 68 S.D. 298, 2 N.W.2d 6, 7 (1942). However, where a physician's lack of skill or care is of a nature that is within the "comprehension of laymen and requires only common knowledge and experience to judge it, expert evidence is not required." *Block v. McVay, supra*, 126 N.W.2d at 810; *see Lohr v. Watson, supra*, 2 N.W.2d at 7; *Haven v. Randolph, supra*, 494 F.2d at 1070; *Bryant v. Rankin, supra*, 468 F.2d at 513.

■ It would seem fundamental in the practice of medicine that if a surgeon arrives at a medical decision relating to the administration of drugs, including an anesthetic to his patient, he must communicate that decision to the nurse who will administer the medication. *See Warwick v. Bliss*, 46 S.D. 622, 195 N.W. 501, 502 (1923).

Moreover, it likewise appears fundamental that a nurse, including a nurse-anesthetist, is obligated to follow a surgeon's order, or at a minimum, advise the surgeon of her disagreement. As we have noted, nurse Johnson acknowledged her obligation to follow such an order. Defendants' expert, Dr. Weingarten, suggesting that a nurse-anesthetist might violate those orders, indicated that a discussion between the surgeon and nurse was necessary and without agreement the operation should be cancelled. Finally, South Dakota statutory law authorizes a professional nurse to administer medications "as prescribed by a licensed physician." *See* S.D. Compiled Laws Ann. 36–9–3.[7]

■ The questions raised by this conflicting evidence did not partake of any scientific or technical nature. Did Dr. Trinidad arrive at a medical judgment not to use Penthrane? Did he communicate his decision to nurse Johnson? Did nurse Johnson disobey or disregard Dr. Trinidad's directions? While expert testimony on these questions might help in explaining the obligations of surgeon and nurse, the lay-jury is perfectly capable of deciding these fact questions. The trial court, however, instructed that the jury could consider only evidence of physicians qualified to speak and, with respect to a nurse's duty, only the evidence of medical experts in the field of anesthetics. These instructions served to exclude Dr. Trinidad's crucial testimony as the court rejected his expertise in the field of anesthetics and served to exclude nurse Johnson's testimony as bearing on Dr. Trinidad's conduct in failing to communicate his medical decision to her.

The court instructed on the issue of the skill and learning of the surgeons as follows:

By undertaking professional service to a patient a physician and surgeon represents that he has the necessary degree of skill and learning to do so. That degree of skill and learning is generally measured by the skill and learning possessed by other physicians and surgeons in good standing practicing in similar localities under similar circumstances, and in view of the *absence of testimony to the contrary you are instructed that the defendants possessed such skill and learning.* (Emphasis added).

---

7. The text of that section reads:

The "practice of professional nursing" means the performance for compensation of any act in the observation, care, evaluation, and counsel of the ill, injured or infirm, or in the maintenance of health or prevention of illness of others or in the supervision and teaching of other personnel, or the administration of medications and treatments as prescribed by a licensed physician or licensed dentist; requiring substantial specialized judgment and skill and based on knowledge and application of principles of biological, physical and social science. The professional nurse may perform in addition to the foregoing, such special acts, with appropriate training, delegated by a physician licensed under the Medical Practice Act of South Dakota or by the medical staff of an employing medical facility licensed by the state of South Dakota. The foregoing shall not be deemed to include the practice of medicine, dentistry, or pharmacy.

The court similarly instructed concerning the skill and learning of the nurse-anesthetist:

By undertaking professional service to a patient a nurse-anesthetist represents that she has the necessary degree of skill and learning to do so. That degree of skill and learning is generally measured by the skill and learning possessed by other nurse-anesthetists in good standing practicing in similar localities under similar circumstances, *and in view of the absence of testimony to the contrary you are instructed that the defendant possessed such skill and learning.* (Emphasis added).

In view of the marked conflict in testimony outlined above—whether Dr. Trinidad made a determinative medical decision on which anesthetic to use; whether he communicated such a decision to nurse Johnson; and whether she violated an express order in administering Penthrane—these instructions in substance could be taken as directing a verdict for nurse Johnson and Dr. Trinidad on the issues of negligence in this case.[8]

█ The appellant takes issue with the court's instruction on proximate cause since during the course of the instructions the court periodically advised the jury that the plaintiff had the burden of proving as to each defendant that the negligence of that defendant was "the" proximate cause of Mrs. Carlsen's death rather than merely "a" proximate cause. Although the trial court did properly instruct on proximate cause,[9] the court otherwise erred in repeatedly advising the jury that the plaintiff was required to show that the negligence of each defendant was "the" proximate cause of death.

IV. *Evidentiary Rulings.*

A. *Obligation of Nurse-Anesthetist to Follow Surgeon's Orders.*

█ The court restricted testimony relating to due care of the nurse and attending physicians to the standard applicable to the practice of nursing and medicine in the Deadwood, South Dakota, area.[10] Nevertheless, the obligation of a nurse to comply with a physician's instructions and directions is governed, at least in part, by a statute of statewide effect. *See* note 6, *supra.* Thus, a nurse in Deadwood, South Dakota, assumes the same duty in administering medications under a physician's direction as a nurse at any hospital in South Dakota.

Dr. Robert K. Johnson, an internal medicine specialist and a member of a hospital staff in Rapid City, South Dako-

---

**8.** The instruction on nurse Johnson seems particularly prejudicial. The court had initially instructed only that it was the duty of the nurse-anesthetist to use that skill and learning used in similar cases by reputable members of her profession practicing in similar localities. After the initial complete reading of the jury instructions, the court modified this instruction to add the underlined phrase in the above quotation. This instruction then became a separate and final instruction, emphasizing nurse Johnson's possession of appropriate skills, and by implication their proper exercise.

**9.** The court's general instruction on proximate cause included the following:

When the expression "proximate cause" is used, it means that cause which is an immediate cause and which, in natural or probable sequence, produced the death complained of. It is a cause without which the death could not have been sustained. (It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the death).

When the negligent acts or omissions of two or more persons contribute concurrently, and as proximate causes, to the injury and damage of another, each of such persons is liable. This is true regardless of the relative blame or fault of each.

**10.** Based on several South Dakota cases, the court adopted the "same or similar community or locality" rule. We cannot say that the court erred in this ruling. *See Block v. McVay*, 80 S.D. 469, 126 N.W.2d 808 (1964); *Hansen v. Isaak*, 70 S.D. 529, 19 N.W.2d 521 (1945); *Warwick v. Bliss*, 46 S.D. 622, 195 N.W. 501 (1923).

ta, was not permitted to testify concerning relationships between a physician or surgeon and a nurse or nurse-anesthetist relating to the prescription and administration of anesthetics. It would appear that the testimony of any qualified physician serving on a hospital staff in South Dakota and working with nurses and nurse-anesthetists should be able to explain that relationship to a jury. We are not prepared to say that in the context of this case the exclusion of that testimony constituted prejudicial error. However, in light of our comments here, in retrial the court may wish to review its order.[11]

### B. Impeachment of Carlsen.

The defendants offered and the trial court admitted into evidence the record of a misdemeanor conviction of Ed Carlsen before a county justice in Adams County, North Dakota, on August 4, 1971, for an assault and battery against his wife. This record, denominated as Exhibit B, included a criminal complaint, an entry of a guilty plea and details of the proceedings, and punishment.

 Evidence of a misdemeanor conviction not relating to dishonesty or falsification may not be admitted for general impeachment purposes under Rule 609(a) of the new Federal Rules of Evidence. We recognize, of course, that these rules were not in effect at the time of trial. However, evidence of a misdemeanor conviction is also not admissible for general impeachment purposes under South Dakota law unless it relates to veracity. See State v. Olson,

83 S.D. 260, 158 N.W.2d 526, 527–28 (1968).

Appellees contend that the court properly admitted this exhibit into evidence in contradiction of Carlsen's direct testimony that his relationship with his wife was "good, very good" and that he drank only moderately prior to his wife's death.

 The matters included in Exhibit B went far beyond showing only a conviction of a crime. The record disclosed the commission of an aggravated assault upon Mrs. Carlsen, details of Carlsen's arrest and of his waiving his constitutional rights, even receiving *Miranda* warnings, and finally, details of punishment, including an extraneous comment of the county justice asserting "no public intoxication for one year."

Even if the record of conviction of the crime as such were admissible for impeachment, the exhibit goes far beyond the rule which ordinarily limits the record of the crime to bare details.

> On the whole, however, the more reasonable practice, minimizing prejudice and distraction from the issues, is the generally prevailing one that beyond the name of the crime, the time and place of conviction, and the punishment, further details such as the name of the victim and the aggravating circumstances may not be inquired into. [C. McCormick, *Evidence*, § 43, p. 88 (2d ed. 1972).]

The admission of the entire county justice record into evidence also served to attack Carlsen's credibility by extrinsic evidence of conduct. The introduction of this evidence violated Rule 608(b) of the Federal Rules of Evidence.[12]

---

11. We note that although the court's rationale for rejecting Dr. Johnson's testimony was that he did not have personal knowledge or experience of Deadwood or similar communities, the court allowed defendant's expert, Dr. Michael Weingarten, a Milwaukee anesthesiologist, to testify that a nurse-anesthetist is not necessarily obligated to follow a surgeon's order. We do note, however, that this testimony was elicited by plaintiff's counsel on re-cross without objection from the defendants.

12. That section reads:

Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1)

For these reasons the admission of Exhibit B constituted error although not prejudicial error in light of the discussion below.

At least in a tangential sense, evidence of violent conflict between Ed Carlsen and his wife may reflect on the credibility of Carlsen's direct testimony that he and his wife got along well and serves to minimize his own claim for damages. Thus, on retrial, evidence of Carlsen's altercations with his late wife may become subject to inquiry to a reasonable degree in the discretion of the trial court and the evidence of his guilty plea to the assault charge may be admissible as an admission of a party to the lawsuit under Rule 801(d)(2), Federal Rules of Evidence.

But, the evidence of Carlsen's misconduct must not be permitted to reflect in any adverse way against the validity or value of the children's own claim for damages, should they be entitled to recover. Such testimony may very well tend to enhance the children's damages through loss of their more responsible parent. The district court, therefore, on request, must take appropriate steps including appropriately instructing the jury upon the purpose and effect of this evidence and thus insure that the interests of the children are not prejudiced by such evidence.

### C. *Other Evidentiary Rulings.*

■ The plaintiff complains that other rulings on admission of testimony from expert witnesses were unduly restrictive. These contentions relate primarily to the testimony of physicians Dr. Trinidad, Dr. Javurek, and Dr. Johnson. We have reviewed these claims of error and do not believe that any of the rulings constitute reversible error.

The record does indicate, however, that the trial court generally confined the testimony of physicians to the narrow scope of their medical practice. Since we remand for a new trial against some of the defendants, it may be helpful to the trial court and the parties to reiterate this court's view of the role of the expert witness. As we recently said in *Holmgren v. Massey-Ferguson, Inc.*, 516 F.2d 856 (8th Cir. 1975):

> The broad and generally stated test for determining the qualifications of a given witness to testify as an expert is whether his knowledge of the subject matter is such that his opinion will most likely assist the trier of fact in arriving at the truth. [*Id.* at 857–58.]

*See Twin City Plaza, Inc. v. Central Surety & Insurance Corp.*, 409 F.2d 1195, 1203 (8th Cir. 1969); *cf. Harris v. Smith*, 372 F.2d 806, 812–15 (8th Cir. 1967).

### D. *Other Errors.*

■ We reject plaintiff's additional claims of error as being without merit. It was not improper for the trial court to deny an amendment to the complaint immediately preceding trial [13] nor to decline to submit other theories of liability to the jury.

### V. *Summary.*

We are satisfied from our reading of the record that under the circumstances, plaintiff did not receive fair consideration of the claims against nurse-anesthetist Carol Johnson, her employer St. Joseph's Hospital, and Dr. Rueben Trinidad, and that the plaintiff is entitled to a new trial against those parties.

Accordingly, for the reasons stated herein, we affirm the judgment of dismissal in favor of Dr. A. J. Javurek and Abbott Laboratories, but reverse as to Dr. Rueben Trinidad, Carol Johnson, and her employer, St. Joseph's Hospital of Deadwood, South Dakota.

concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of his privilege against self-incrimination when examined with respect to matters which relate only to credibility.

13. Prior to retrial, of course, either party may request leave to amend the pleadings.

## ORDER ON PETITIONS FOR REHEARING

All parties remaining in this case petition for rehearing. We deny appellees' petitions.

 Appellant Ed Carlsen, among other things, suggests that on retrial he should be permitted to present the theory of lack of informed consent. Nothing in our opinion bars him from presenting evidence to the jury on any issue raised by the present pleadings or amendments thereto against the remaining defendants, Dr. Trinidad, nurse Carol Johnson, and her employer, St. Joseph's Hospital.

Whether any particular theory should be presented to the jury will rest on a record yet to be made.[1]

Subject to the foregoing comment and clarification of our opinion of November 7, 1975, appellant's petition for rehearing is also denied.

1. Although our opinion imposes no limitation upon the rights of the parties in presenting evidence in support of their respective contentions, we add an additional comment on the prior record. In our opinion, we noted that the parties consumed eight days in the trial of a case in which "the salient testimony bearing on liability [was] not unduly extensive nor complicated * * *." At 205. By this comment we intended to suggest that all of the parties often strayed far from the basic issues in the case.

With appropriate cooperation between an experienced trial judge and able counsel, this case should consume far less time on retrial.