**Sue Ann WALKER, Plaintiff,**

v.

**NORTH DAKOTA EYE CLINIC, LTD., a Professional Corporation, Defendant.**

Civ. No. A2–75–11.

United States District Court, D. North Dakota, Northeastern Division.

July 12, 1976.

Robert Vaaler, Vaaler, Gillig, Warcup, Woutat & Zimney, Grand Forks, N. D., for plaintiff.

Patrick J. Maddock, Degnan, McElroy, Lamb, Camrud & Maddock, Ltd., Grand Fords, N. D., for defendant.

MEMORANDUM OF DECISION AND ORDER

BENSON, Chief Judge.

Plaintiff brought this diversity action alleging the Defendant, through its sole

stockholder, Dr. L. J. Prochaska, was negligent in that the doctor failed to inform her that she could possibly sustain long term or permanent diplopia (double vision) as a result of strabismus surgery on her left eye. The Defendant counterclaimed for $335.00 for the professional services rendered by Dr. Prochaska. The action was tried to the Court without a jury.

### Findings of Fact

The Defendant is a professional corporation organized under the laws of North Dakota, whose sole stockholder at all times material to this lawsuit was Dr. L. J. Prochaska, a licensed physician and diplomate of the American Board of Ophthalmology. His practice was confined to ophthalmology and ophthalmic surgery. Plaintiff is a resident of Oklahoma.

On March 29, 1973, Plaintiff consulted Dr. Prochaska complaining of severe headaches and pressure behind the eyes and blurred vision. Examination revealed that upon gazing to the left Plaintiff had excellent fusion, on straight ahead gaze she had good fusion, but on gaze to the right she had a condition known as diplopia (double vision). Her left eye became diffused and unable to track in the same line as the right eye. The more the eye moved to the right, the more the left eye would move up, until the pupil would disappear under the eyelid, a condition known as hypertropia, a type of strabismus squint. This condition is also medically described as incomitant heterotropia, and it was the doctor's opinion it was a condition that had existed with the Plaintiff for a long time. It was further his opinion that Plaintiff, as her eyes moved right, unconsciously compensated by pulling the images together to the point of suppressing the vision in her left eye, thereby eliminating the double vision. When fatigued or ill, she would have more difficulty maintaining fusion and this resulted in symptoms commonly called eye strain, and caused headaches with severe pressure behind the eyes, all of which were symptoms of hyperphoria.

Dr. Prochaska concluded that to remedy her condition it would be necessary to perform a tenotomy to the left eye, a procedure known as strabismus surgery. This was intended to restore binocular vision in all fields of vision and relieve eye strain. Secondarily, it would remove psychological and social handicaps. The prognosis for fusion, after surgery, on gaze right without diplopia or suppression was excellent, and the doctor expected no complications.

Dr. Prochaska discussed the nature of the problem and the proposed surgery with the Plaintiff. She was apprehensive about having surgery, but after discussing it with her husband, decided to have it done. Dr. Prochaska performed the surgery on April 11, 1973. Plaintiff concedes that the operation was performed in accordance with usual established procedures, and that Dr. Prochaska possessed the necessary degree of skill and learning required to perform the operation. Plaintiff's recovery was uneventful, but she had double vision in all fields of gaze. Short term diplopia is very common after strabismus surgery, but long term diplopia is very rare, and occurs in less than one percent of the cases when surgery of the type performed on Plaintiff is done.

When the diplopia persisted, Dr. Prochaska prescribed prism lenses that he referred to in his discussions with Plaintiff as training glasses, and which, when worn, restored binocular vision in all fields of gaze except up. The plan was to gradually reduce the prism in the glasses as the eye muscles achieved the ability to fuse without the aid of corrective glasses. On Plaintiff's last visit to Dr. Prochaska on August 9, 1973, she was instructed to return in six months, or if there was a change to return sooner. Plaintiff testified she understood the doctor to have told her to return in six months if there was a change. She did not return, thereby making it impossible for Dr. Prochaska to follow the treatment plan. At time of trial in April, 1976, Plaintiff was continuing to wear the training lenses with the prisms as prescribed shortly after the surgery. Her condition had improved so that with the glasses she had binocular vi-

sion in all fields of gaze. Without glasses she had double vision in all fields of gaze except down.

The only evidence on the cause of Plaintiff's present double vision is Dr. Prochaska's testimony that the eye has slightly overcorrected. He further testified such a reaction is unheard of as a result of this type of strabismus surgery on this type of patient.

Dr. Prochaska did not inform the Plaintiff of the remote possibility that surgery could cause her to suffer permanent double vision in all fields of gaze. She testified if she had been informed of the potential risk, it would have affected her decision to have surgery.

A distinction exists between incomitant heterotropia and comitant heterotropia. Incomitant heterotropia is a condition in which the amount of deviation in the squinting eye varies according to the direction in which the eyes are turned. The deviation of comitant heterotropia is fairly constant in whatever direction the eyes are turned and one with that affliction has less ability to fuse than one with incomitant heterotropia. The prognosis for obtaining binocular vision by strabismus surgery for one with comitant heterotropia is not as good as one with incomitant heterotropia, and while persistent post-operative diplopia is rare in either case, there is a measure of possibility of its occurrence in comitant heterotropia that may require a disclosure to a patient who seeks surgery for cosmetic purposes.

It is not a standard medical practice among ophthalmologists to inform patients with incomitant heterotropia of the less than one percent possibility that strabismus surgery could cause long term or permanent double vision.

The fair and reasonable value of the medical services rendered to the Plaintiff by the Defendant was $335.00, which has not been paid.

## Conclusions

The Court concludes that Defendant is entitled to a judgment for dismissal of Plaintiff's cause of action, and for the recovery of the sum of $335.00 from the Plaintiff for services rendered.

## Rationale

Plaintiff's case is grounded on the doctrine of informed consent, and she has alleged:

"That prior to and on April 11, 1973, and prior to the performance of the strabismus surgery, Dr. Prochaska was negligent, reckless, and careless in that he failed to inform the plaintiff, in non-technical terms, what alternatives were open to her, other than surgery, the goals expected to be achieved by such surgery, and the risks of after effects or results that might occur as a result of the surgical procedure; the conditions found and diagnosed by Dr. Prochaska having been a condition known to the plaintiff, with which she had been afflicted since early childhood, for which she had been able to accommodate and tolerate without prior surgical intervention."

Dr. Prochaska has admitted that prior to surgery, he did not discuss with the Plaintiff the risk of double vision resulting from the surgical procedure he recommended. The Plaintiff contends he had a duty to do so, and that his breach of that duty caused her to undergo the surgery which is a proximate cause of the double vision she now experiences. She testified if the doctor had informed her of the risk, it would have affected her decision on the surgery, the inference being she would not have consented to it if she had understood the collateral risk.

The Plaintiff has the burden to establish the existence of the duty. She has taken the position that she need not establish through expert testimony that it was standard medical practice in the community for a physician to disclose the risk of double vision which existed in this case. She rests her case on the doctor's admission that the risk was not disclosed to her, and that double vision, which she believes is a permanent condition, resulted. The evidence on

whether the condition is permanent is not conclusive because she failed to return to the doctor, thus denying him an opportunity to carry through on his plan of treatment.

■ Plaintiff, however, has sought to establish the existence of the duty through an excerpt from a medical treatise. She was permitted, pursuant to Rule 803(18), Federal Rules of Evidence, to read into evidence, under the general heading, Post-Operative Complications, from *Binocular Vision and Ocular Motility* by Burian and von Noorden, the following:

> "Persistent postoperative diplopia is rare, probably because most patients remain slightly undercorrected after strabismus surgery, and the area of suppression extends from the retinal periphery to the fovea in most forms of horizontal strabismus and some forms of vertical strabismus. Nevertheless, the danger of persistent, distressing, postoperative diplopia must be pointed out to all adults who desire cosmetic correction of the deviation. It is then up to the patient to decide whether he is willing to take the risk. To assess this risk preoperatively and to give the patient a chance to experience diplopia, we fully or nearly fully correct the deviation with prisms placed in trial frame or fitover frame in front of his glasses. Even if diplopia can be elicited in this way, this does not prove that it will be present after surgery; however, the possibility exists, and the patient at least has been shown what is meant by double vision."

However, Dr. Prochaska testified that the passage read into the record referred to patients afflicted with comitant heterotropia. As noted in the findings, Plaintiff's affliction was incomitant heterotropia. The testimony of the doctor on this point was not effectively disputed. The treatise, therefore, lacks relevancy to the facts of this case, and Plaintiff has failed to show that such a standard medical practice of disclosure existed either in the community or in the specialty generally.

Plaintiff argues that the duty of disclosure may be proved by lay testimony.

"The general rule is that only expert testimony may establish the negligence of a physician, i. e., that a doctor has breached a standard of care required of him. *Marchlewicz v. Stanton*, 50 Mich.App. 344, 213 N.W.2d 317 (1973). *Hestbeck v. Hennepin County*, 297 Minn. 419, 212 N.W.2d 361 (1973); *Perin v. Hayne*, Iowa, 210 N.W.2d 609 (1973). The exceptions to this rule . . . are instances where the physician's lack of care is so obvious as to be within the comprehension of a layman, or, secondly, where the physician injured a part of the body not involved in the treatment. *Perin v. Hayne*, 210 N.W.2d 609 (Iowa 1973)." *Roberson v. Christoferson*, 65 F.R.D. 615, 621 (D.N.D. 1975). *Accord, Canterbury v. Spence*, 150 U.S.App.D.C. 263, 464 F.2d 772, 783 n. 38 (1972).

Plaintiff cites *Canterbury* as authority that lay testimony is sufficient to establish a standard of medical practice in non-disclosure cases. The Court in *Canterbury* stated:

> "[M]edical facts are for medical experts and other facts are for any witnesses—expert or not—having sufficient knowledge and capacity to testify to them. It is evident that many of the issues typically involved in nondisclosure cases do not reside peculiarly within the medical domain. Lay witness testimony can competently establish a physician's failure to disclose particular risk information, the patient's lack of knowledge of the risk, and the adverse consequences following the treatment. Experts are unnecessary to a showing of the materiality of a risk to a patient's decision on treatment, or to the reasonably, expectable effect of risk disclosure on the decision." *Canterbury v. Spence, supra* at 792 (footnotes omitted).

■ The precise question is whether in North Dakota expert testimony is necessary to establish a duty to disclose to a patient that as a result of strabismus surgery he or she runs less than a one percent risk that long term or permanent diplopia may develop.

The *Canterbury* Court recognized that "[i]t seems obviously prohibitive and unrealistic to expect physicians to discuss with their patients every risk of proposed treatment—no matter how small or remote—and generally unnecessary from the patient's viewpoint as well." *Canterbury v. Spence, supra* at 786. Expert testimony is not necessary to establish a duty the breach of which is a "blunder so egregious that a layman is capable of comprehending its enormity. An example is the case of a surgeon who leaves a sponge in an incision after removal of a kidney." *Haven v. Randolph*, 161 U.S.App.D.C. 150, 494 F.2d 1069, 1070 (1974).

No precise rule is available to determine at what point the existence of a duty is within the realm of competency of laymen to ascertain or at what point the duty must be defined by one who possesses special competency as an expert in the specialty involved. Each case must be decided on its own facts. It does not, for example, take an expert to recognize that an egregious blunder is the breach of a duty. However, this Court is not prepared to infer from the facts in this case that Dr. Prochaska's failure to disclose to Plaintiff the risks involved was such a blunder. This Court declines to follow the lead of *Canterbury* that lay testimony is sufficient to establish a duty in all non-disclosure cases.[1]

IT IS ORDERED that judgment be entered for the Defendant for dismissal of Plaintiff's cause of action, and for the recovery of the sum of $335.00 from the Plaintiff for services rendered.

---

1. *Canterbury v. Spence, supra*, recognized two exceptions to the general rule of disclosure that are not applicable to this case. 150 U.S.App. D.C. 263, 464 F.2d 772, 788–789 (1972).