JUDITH A. SCHENK, Plaintiff-Appellee

v.

THE PEOPLE OF THE TERRITORY OF GUAM,
Defendants-Appellants

Civil No. 116-A

District Court of Guam

Appellate Division

September 9, 1977

Before DUENAS and WONG, *District Judges*, and HEF-NER, *Designated Judge*

PER CURIAM

## OPINION

This appeal is from a decision of the Superior Court of Guam entered on April 4, 1975, awarding plaintiff $80,000 for injuries resulting from an abortion performed in a municipal hospital. The government of Guam and Guam Memorial Hospital were the named defendants in this action (while another action was commenced against the operating physician in the District Court of Guam). Two separate trials were held because the Superior Court of Guam has exclusive jurisdiction against the government of Guam under the Government Claims Act (which does not provide for jury trials).

## FACTS

Judith A. Schenk, a teacher working in Truk, came to Guam in early August of 1973 for the purpose of obtaining a therapeutic abortion. After several inquiries, Mrs. Schenk approached Dr. Vivian Batoyan, who agreed to do the operation after a psychiatrist concluded that an abortion was essential and that sterilization was to be recommended. Dr. Batoyan performed the operation on the evening of August 17, 1973, at the Guam Memorial Hospital. Dr. Batoyan was a private physician and not an employee of the hospital

443

but she had hospital privileges (her qualification had been reviewed by a hospital committee and she was board eligible).

Unfortunately due to improper diagnosis Dr. Batoyan failed to remove all parts of the fetus during the operation and these parts continued to grow. Four months later another operation was required and a hysterectomy had to be performed because of excessive bleeding during surgery.

Assisting Dr. Batoyan during the August 17 operation was a nurse, an employee of the hospital. Plaintiff bases her cause of action under a theory of respondeat superior and also a theory that the hospital itself failed in a duty to make certain that Dr. Batoyan had correctly performed the abortion.

### ISSUES ON APPEAL

Appellant offers two appealable issues:

1. Was the Guam Memorial Hospital negligent as a matter of law?

2. Were awarded damages excessive?

### NEGLIGENCE OF GUAM MEMORIAL HOSPITAL

■ In order for the hospital to be liable, there had to be evidence at trial to suggest either (1) that under a theory of respondeat superior the hospital was vicariously liable for the negligent acts of one of its employees or (2) that the hospital independently owed a direct legal duty to supervise the operation and to provide for effective clinical review after surgery. The court finds that no such evidence was adduced at trial and that the judgment must be reversed.

1. *The question of the hospital's vicarious liability under a respondeat superior theory.*

■ Clearly, Dr. Batoyan was not an employee of the hospital although she had hospital privileges. Therefore, in

order for Guam Memorial Hospital to be liable under respondeat superior evidence must have been offered to show that either the assisting nurse or the pathologist (both hospital employees) was somehow negligent and had a duty to determine whether all fetal parts were properly removed from the patient. No such evidence was offered at trial by the plaintiff, while the defense offered extensive testimony that a nurse and a pathologist are under no duty to make such clinical and medical evaluations.

At pages 267–68 of the transcript, Nellie Tinsey, head nurse of the GMH operating room, testified that it was not the duty of the operating room nurse to determine if all parts of the fetus had been removed. Brihidia C. Aguigui, the director of nursing service, testified to the same effect, stating that the operating nurse's only duty was to make sure that all fetal material removed from the uterus was placed in a receptacle and delivered to the pathological laboratory. (Transcript, pages 270–271.) Finally, Dr. Vergilio Lopez (a qualified D & C [Dilatation and Curettage] surgeon, as stipulated by both parties) testified as follows:

. . .

In a D & C operation, it is not the function of the operating room nurse to determine if all fetal parts have been removed (Transcript, page 295. See also testimony at pages 256 and 332).

Plaintiff offered no contrary evidence to suggest that the operating room nurse had a duty to make certain that all fetal parts had been removed, and the court finds that under these facts the nurse only had a duty to make certain that all fetal parts were properly delivered to the pathologist and that this duty was properly performed.

In addition, plaintiff has argued that by requiring more clinical history from the surgeon, the pathologist might have realized that a fetus was still present and growing within the patient. However, no evidence or legal authority was offered to suggest that the pathologist had a duty to

445

make such a clinical evaluation and question Dr. Batoyan's diagnosis of incomplete abortion. According to expert testimony, a pathologist is only responsible for examining and correctly identifying samples sent to him from surgery. (Transcript, pages 295–96, 54:10, 58:11, 91:3, 368–369.) It is true, however, that a pathologist *may*, if he wishes, request additional clinical history from the physician in charge (transcript, page 59:19), but no evidence was offered to suggest that the pathologist should have been aware of any irregularity in this instance. He was provided with a sample from the D & C operation and his function was to identify this sample. Dr. Leung Chen testified that a 15 cc sample was consistent with an eight-week pregnancy diagnosed as an incomplete abortion. (Transcript, pages 316–18.)

Plaintiff doesn't really suggest what additional clinical information the pathologist should have requested, except to suggest that if the abortion had been properly diagnosed as therapeutic (i.e. induced), the pathologist would have become concerned and contacted the surgeon. (Transcript, page 262:8.) However, the pathologist had no reason to doubt Dr. Batoyan's diagnosis of incomplete abortion and there is nothing in the record to suggest that if he had asked for more clinical information she would have changed this diagnosis to one of therapeutic abortion. Even Dr. Hobson, the plaintiff's expert witness, admits that the pathologist's report was consistent with the surgeon's diagnosis supplied to him (transcript, pages 261:22–262:5) and that it is not the function of the pathologist to determine whether all parts of the fetus have been removed unless "information is given to him to make this part of his report." (Transcript, pages 256:8–257:1.) Finally, it should be pointed out that even in instances of a therapeutic abortion, there are many cases where the fetus does not develop at all and the absence of a fetus would not neces-

sarily be cause for alarm. (Transcript, pages 334:20–335:4; see also, pages 365, 310:15.)

Testimony established that the operation was under the sole control of the surgeon, Dr. Batoyan. Plaintiff has offered nothing to suggest that the pathologist should have been aware of any irregularity and should have requested additional information. The pathologist had a duty to correctly identify the sample delivered to him; this he did accurately and there are no facts (or legal authority offered) to suggest that he was negligent in failing to ask Dr. Batoyan for more information. If we are to accept plaintiff's arguments, a pathologist would always be required to request the patient's entire clinical history and spend the better part of his day double-checking the surgeon and offering his own independent diagnosis. Patently, this is not the function of the pathologist; uncontradicted testimony has stated that his main responsibility is to correctly identify tissues and organs and not to make clinical diagnoses.

2. *The hospital's independent duty to review the surgeon's diagnosis and operating procedures.*

Plaintiff has offered into evidence medical manuals having to do with accreditation of hospitals, the American Medical Association guides to ethics and the by-laws of Guam Memorial Hospital. While these manuals perhaps provide a useful framework in determining standards of negligence, it must be pointed out that these manuals do not set up a legal rule establishing liability such as provided in a legal decision. These manuals are proposed ideal standards as to accreditation and recognized procedures and it should not be supposed that a violation of one of these standards will result in a strict or absolute liability for a hospital. Unfortunately, the trial judge seems to have accepted these standards as legal authority when he states as follows:

447

In seeking the standard of care that is to be exercised by the hospital, this court has been aided by an expert witness, Dr. G. C. Hobson, the By-Laws of the Medical Staff of the Guam Memorial Hospital, and the Accreditation Manual for Hospitals, up-dated 1973 (Exhibits B and C).

. . .

It is crystal clear that compliance with the By-Laws and the Manual for Hospital Accreditation was ignored during the confinement of this patient. There was no clinical history sent with the tissue to the pathologist. The pathologist made no inquiry after finding no fetal parts. No medical Review Committee was in existence to review medical records. No Tissue Committee to review surgical procedure. The hospital records indicated Incomplete Abortion as an admitting and final diagnosis. The psychiatrist, Dr. David Kennedy, recommended Therapeutic Abortion.

█ It is true as the trial court has stated above, that the defendant hospital failed to follow certain recommended procedures for surgical review as set forth by the Accreditation Manual for Hospitals and its by-laws (although testimony at page 363 of the transcript shows that certain surgical review was provided for on a random basis). However, before attempting to prove which standards of conduct the hospital should be held to, it is incumbent that the plaintiff cite authority showing that a hospital owes a duty to supervise and review the surgery of a *private* physician who has used hospital facilities to treat his or her patient. Plaintiff has offered no authority indicating that a hospital has ever been found liable under the facts alleged in her complaint (and argued in her legal memoranda), and the court has similarly been unable to find such authority.

None of the cases supporting the trial court's decision hold that a hospital owes such a duty to review a private physician's diagnoses and surgery even though hospital facilities have been used to operate. In *Bing v. Thunig*, 2 N.Y.2d 656, 143 N.E.2d 3, liability was based entirely on a respondeat superior theory (where one of the hospital

employees was proved negligent—unlike the case here on appeal). *Hendrickson v. Hadkin,* 294 N.Y.S. 982, 983 (1937), is inapposite and even supports the position of the hospital because the court found it reversible error to instruct a jury that in determining liability they could consider the fact that a hospital failed to review a private physician's treatment for cancer:

. . .

Assuming the hospital was under a duty to exercise such care, the scope of such duty did not extend to the professional treatment administered by plaintiff's own doctors, whether they were licensed or not. The respects in which it is claimed the hospital was derelict all pertain to such professional treatment, with which appellant had no right to interfere. Further assuming the appellant in the respects mentioned was negligent, such negligence must be attributed to its doctors and nurses. The rule is now well settled that a hospital, whether charitable or private, is immune from liability to patients by reason of negligence of its doctors and nurses with respect to any matter relating to the patient's medical care and attention. [Citations omitted.]

Finally, the trial court cites *Darling v. Charlestown Community Memorial Hospital,* 211 N.E.2d 253, 14 A.L.R.3d 860 (1965), in support of its decision. However, again in this case, liability was based at least partially on respondeat superior because the negligent nurses and surgeon were all employees of the hospital. It is true that in 14 A.L.R.3d at page 879, the commentators do suggest that *Darling* might represent a new theory of independent negligence against hospitals:

. . .

Even in the absence of an employer-employee or principal-agent relationship between the negligent doctor and the hospital, there now appears to be some chance, in view of the decision in *Darling v. Charlestown Community Memorial Hospital* (1965), 33 Ill.2d 326, 211 N.E.2d 253, 14 A.L.R.3d 860, infra § 3, cert. den. 383 U.S. 946, 16 L.Ed.2d 209, 86 S.Ct. 1204, to impose liability on the hospital on the theory of independent negligence in failing to review, super-

vise, or consult about, the treatment given by the physician directly in charge, if the situation indicates that the hospital had the opportunity for such review but failed to exercise it, or that its servants (usually nurses or residents) were negligent in failing to call the attention of the proper hospital authorities to the impropriety or inadequacy of the treatment being given.

However, it is unclear on what facts the jury found liability in *Darling* and the court's language suggesting a broadened basis for liability was taken from *Bing v. Thunig*, supra, which dealt with the issue of vicarious liability and not independent negligence in failing to supervise physicians.

Also, *Darling* has been interpreted in *Collins v. Westlake Community Hospital*, 299 N.E.2d 326, 329 (1973), to be applied rather narrowly on its facts:

. . .

The evidence in *Darling* showed not only grossly improper medical treatment by the attending physician, but also a continuing and total failure by the hospital staff to recognize, report and react to a multitude of glaringly obvious signals indicating either the existence of a condition in the patient upon which the employed treatment had no effect, or grossly improper medical treatment by the attending physician.

In the instant case, unlike in *Darling*, there was no evidence to suggest that Dr. Batoyan was not qualified to perform surgery or that the hospital staff was somehow negligent (in failing to determine whether the fetus was still present within the patient). Also, the court in *Collins*, supra, stresses the fact that the *Darling* case concerned a negligent surgeon who not only was an employee of the hospital but had been placed on emergency call by the hospital when he was unqualified to do orthopedic surgery. The case here is also distinguishable because evidence suggested that an actual review of Dr. Batoyan's surgery would not have revealed any irregularity since there were

no obvious or gross signs that Dr. Batoyan had erred in her diagnosis. (Transcript, pages 310–15.)

Finally, the plaintiff does not explain how the court can ignore such cases as *Haven v. Randolph*, 342 F.Supp. 538 (D.C. D.C. 1972) (cited by defendant), which states that "[a] hospital is liable for the acts of a physician only if he is employed by the hospital and/or acts as agent for the hospital [citing cases]." (342 F.Supp. at 542; aff'd 494 F.2d 1069 (D.C. Cir. 1974).) If the court were to accept Dr. Hobson's testimony that the hospital was negligent in failing to completely follow the Accreditation Manual standards for surgical review, we would have to hold that a hospital must review every one of the several hundred cases it handles monthly and that any deviation from the manual will result in absolute liability. While the trial court's findings are to be afforded great deference, there simply is not sufficient evidence or legal authority to suggest that the hospital could be independently negligent in failing to review an operation under the control of a private physician, which from all indications appeared to have been successful.

## DAMAGES

The court's determination on appeal that the defendant hospital was not negligent as a matter of law and fact has rendered the question of excessive damages moot. Reversed.