Cheryll LaROCHE and Fritz
LaRoche, Appellants,

v.

UNITED STATES of America, Appellee.

No. 83–1672.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 13, 1983.

Decided March 23, 1984.

Rehearing Overruled May 1, 1984.

Philip N. Hogen, U.S. Atty., Bonnie P. Ulrich, Asst. U.S. Atty., Sioux Falls, S.D., for appellee.

Charles Rick Johnson, Johnson, Eklund & Davis, Gregory, S.D., for appellants.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BRIGHT, Circuit Judge.

LAY, Chief Judge.

Cheryll LaRoche and her husband Fritz are members of the Lower Brule Sioux Tribe. They brought suit against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2674 (1976). The complaint alleged negligence against Dr. Philip L. Hopper, an Indian Health Service dentist for the Public Health Service at Fort Thompson, South Dakota. Cheryll LaRoche sought damages for her medical expenses and pain and suffering; her husband Fritz sought damages for lost services, comfort, care, companionship, and consortium. After a bench trial, the district court [1] concluded that Dr. Hopper was not negligent and entered judgment for the United States. The LaRoches appeal this judgment. We vacate and remand to the district court for reconsideration.

On October 19, 1978, Cheryll LaRoche sought dental care from Dr. Hopper. Ms. LaRoche was experiencing pain and tenderness in her lower jaw. Dr. Hopper determined that this was being caused by a bacterial infection and that, in order to arrest the infection, root canal surgery would be necessary.

Dr. Hopper performed root canal procedures on October 27, 30, and November 15, 1978. This included drilling the nerve canal to allow drainage of decay material, instrumenting the nerve canal to shape it for filling material, and filling the nerve canal with a temporary filling material. Permanent fillings were to be put in on November 21. However, this appointment and a subsequent December 13 appointment were cancelled by Ms. LaRoche. Two other appointments in January and February also were allegedly missed. Ms. LaRoche contends that these appointments were never made. However, the district court made findings of fact that these appointments were made and missed.

On March 5, 1979, Ms. LaRoche returned to Dr. Hopper. The canals were then permanently filled. Ms. LaRoche returned the next day; she was again experiencing pain and localized swelling. Dr. Hopper reopened two of the teeth to initiate draining and prescribed penicillin for the infection. On March 7 the pain and swelling was worse, but Dr. Hopper was in Rapid City working on another case and could not be reached. Ms. LaRoche was ultimately hospitalized because of the swelling and infection. She alleges that Dr. Hopper's negligent treatment of March 5, 1979, was the proximate cause of the pain, infection, swelling, and hospitalization. In a memorandum opinion after the trial, the district court concluded that Dr. Hopper was not negligent and the court entered judgment for the United States.

We have reviewed the record of the proceedings below and find that the district court did not sufficiently analyze the fundamental issue in this case. Whether Dr. Hopper knew or should have known that infection was still present when Ms. LaRoche's teeth were permanently filled and whether he took adequate procedures to protect against that possibility were the ultimate issues confronting the district court. The district court does not address these basic questions; the district court's analysis focused mainly on Ms. LaRoche's missed appointments and Dr. Hopper's failure to use bacteria cultures.

*The Missed Appointments*

The district court concluded that Ms. LaRoche made and missed four appointments between November, 1978 and February, 1979. The court noted that these missed appointments were significant. The court observed that the temporary fillings were inserted November 15 and the testimony

---

1. The Honorable Donald J. Porter, United States District Judge for the District of South Dakota.

reflected they should remain in place for a maximum of seven to ten days. In this case the temporary fillings remained in place until March 5, almost four months later. The court noted evidence that an interval longer than seven to ten days compromises the chance of success by possibly allowing gas or infectious material to enter the nerve canals and irritate or reinfect the tissue surrounding the nerve canals. (R. II 84–86).[2] The district court apparently viewed these missed appointments and the resulting compromised success as evidence of Ms. LaRoche's contributory negligence rather than as evidence bearing on the standard of care that should have been followed by Dr. Hopper. If anything, the fact that temporary fillings had been in place for almost four months and that the chance of reinfection was increased suggests a greater risk of harm to the patient unless proper procedures are followed by the dentist in charge.

The district court also fails to make note of the fact that Dr. Hopper did not wash out the canals with sodium hypochlorite before he put in the permanent fillings. Dr. Garth James, an endodontics expert from the University of Nebraska and the United States' primary expert, testified as to the proper procedures in root canal work. He stated that

> endodontic treatment ... consists of making an access into the back of the tooth, gaining access to that canal area, and with specialized instruments, removing all of the pulpal material here and ... *washing that space with solutions*

> *that will function to both destroy bacteria and dissolve out any continuing pulpal material* that may be there. We use a particular solution for that.... That solution is sodium hypochloride [sic; hypochlorite].

(R. III 40–41) (emphasis added).[3]

This procedure described by Dr. James varies from that testified to by Dr. Hopper. On direct examination by the government counsel, Dr. Hopper stated that on October 27 he accessed into the back of the four teeth and cleaned them out with an instrument called a broach. No mention was made of washing the canals with sodium hypochlorite. Three of the teeth were then closed with a cotton pellet coated with C.M. C.P.[4] and temporarily filled. One tooth was left open because it was continuing to discharge purulent or infection material. Penicillin was prescribed to combat this. (R. II 25–28). Ms. LaRoche returned on October 30 because she was having some pain and swelling in the area. The three temporary fillings were opened to increase the rate of drainage. Ms. LaRoche next returned on November 15. At this time there was no redness, swelling, or drainage. The canals were instrumented— shaped to receive the fillings—and closed with the medication C.M.C.P. and sealed with a temporary filling material. (R. II 30–32). Again, no mention was made of washing the canals with sodium hypochlorite.

Ms. LaRoche's next visit was March 5, 1979. The canals "were opened and reinstrumented and found to be clean and dry."

---

2. The trial record will be referred to as "R." followed by the volume and page number.

3. Dr. Seltzer, whose text was introduced as an exhibit, also advocates washing out the canal to reduce the bacteria count:

> The desirability of at least reducing, if not eliminating, the numbers of microorganisms from the root canal and periapical tissues is not at issue. As has been shown, such microbial reduction can occur from thorough debridement of the root canal and the use of antimicrobial irrigants and intracanal antiseptic or germicidal dressings.

S. Seltzer, *Endodontology, Biologic Considerations in Endodontic Procedures* 304 (1971). Dr.

Grossman's text is similar. *See* L. Grossman, *Endodontic Practice* 252 (9th ed. 1978).

4. C.M.C.P. is an abbreviation for camphorated monochlorophynal. This is a bacteriostatic agent. (R. II 28). Bacteriostatic agents do not destroy bacteria, as sodium hypochlorite does; bacteriostatic agents merely keep the bacteria count static. If there is no bacteria in the area treated with C.M.C.P., the area will remain bacteria-free for the period the C.M.C.P. lasts. Dr. Hopper testified that this was 10 days. (R. I 134). If there is bacteria present, however, C.M. C.P. will keep that bacteria count static. In other words, no bacteria will grow, but no bacteria will be destroyed by the C.M.C.P.

(R. II 42). Dr. Hopper defined his "reinstrumenting" as taking paper points, which are just rolled light pieces of paper that are sterilized, and placing them down the canals to make sure there is no exudate or anything in the canals. Exudate means any type of wet material coming from the body. After this procedure, the canals were permanently filled. (R. II 42–43). No mention was made of washing the canals with sodium hypochlorite. Dr. Hopper's testimony on cross examination was similar, (R. I 113–14), as was his deposition (Hopper deposition at 14).

We make this analysis of the record because, as we noted above, we feel that the fundamental issue in this case—whether Dr. Hopper used the proper procedures in his treatment on March 5 when the permanent fillings were placed—was not addressed by the court below. The testimony of Dr. James, the United States' expert, describes his view of the correct procedures to be used in doing a root canal. A review of Dr. Hopper's testimony shows that he apparently did not follow this procedure. We feel that this potential discrepancy in procedures should be addressed by the district court.[5]

The district court also failed to address the issue of whether Dr. Hopper exercised reasonable care in not evaluating whether the whole procedure should have been reinstituted on March 5. Dr. James testified that it would not be difficult to start over again. In fact, he testified that it would be easier because the basic cleaning and shaping of the canal had been accomplished. (R. III 76–77). Dr. James apparently would have scraped the walls clean

and washed them with sodium hypochlorite and then closed them with C.M.C.P. and new temporary fillings. The next appointment, presumably within 7–10 days, would have entailed rewashing and permanently filling the canal. Dr. Hopper testified that he told Ms. LaRoche on March 5 that the length of time the temporary fillings had been in compromised the chance of success. He stated: "I told her since she waited so long, there was a good chance that it wouldn't be successful but that we would go ahead and try and see how it turned out." (Hopper deposition at 15).

Rather than measuring Dr. Hopper's standard of care in light of this increased risk, the court focuses on, and blames Ms. LaRoche for, the four missed appointments. The expert witnesses for the government followed the same line of thinking. We have difficulty understanding this reasoning. The alleged malpractice takes place subsequent to the missed appointments. Dr. Hopper's responsibility was to proceed with the treatment required under the existing circumstances. If he was concerned there was "a good chance" that permanently filling the teeth at that time would not be successful, then it seems that his original treatment should have been commenced again. The fact that Ms. LaRoche may have set in motion the increased likelihood of infection does not relieve Dr. Hopper from providing proper care under the circumstances. Dr. Hopper should not use a lesser standard of care because the patient did not keep earlier appointments; nor does it follow that he may use a lesser standard of care because

---

**5.** Although negligence in medical malpractice cases ordinarily must be established by the testimony of medical experts, *Carlsen v. Javurek*, 526 F.2d 202, 207 (8th Cir.1975), we feel that whether it is negligent to place permanent fillings in teeth which the dentist knew or should have known were possibly infected without taking proper precautions lies within the "comprehension of laymen and requires only common knowledge and experience to judge it." *Id.* at 208 (quoting *Block v. McVay,* 80 S.D. 469, 126 N.W.2d 808, 810 (1964)). This is not to say that the issue of whether root canals should be washed with antiseptics before filling is an issue

within the comprehension of laymen. Rather, we mean to say that, given the expert testimony of Dr. James and the textbooks of Dr. Seltzer and Dr. Grossman which suggest that proper root canal procedure includes washing the canal with antiseptics to reduce the number of microorganisms, and given the testimony of Dr. Hopper which suggests he did not follow this procedure, and considering the long delay before removing the temporary fillings, we deem it within the comprehension of laymen to determine whether Dr. Hopper's course of action was negligent. We leave this determination to the district court.

he fears she may miss future appointments.

### The Bacteria Culture

 The district court opinion also focused on the use of bacteria cultures. The district court concluded that the United States adequately rebutted any assertion that bacteria cultures should have been taken to determine whether the root canals were still infected.[6] However, this rebuttal evidence concerning cultures does not defeat the strong inference of negligence arising from Dr. Hopper's immediate insertion of permanent fillings without further prophylactic steps being taken some four months after temporary fillings had been inserted. The district court's broad conclusions with respect to taking cultures make it appear that this does rebut the inference of negligence. The district court stated:

> Upon all the evidence the Court concludes that plaintiff failed to show by a preponderance that Dr. Hopper breached his duty to plaintiff by failing to perform bacteria cultures at the time in question.

> Dr. Hopper acted according to accepted dental practice; moreover, the evidence does not establish by the necessary preponderance a causal connection between plaintiff's final untoward result and the omitting of a bacteria culture before permanent placement of the root canal fillings.

This discussion fails to analyze the actual issues in the case, to wit, whether Dr. Hopper knew or should have known, in light of existing circumstances, that there existed an increased possibility of infection and whether, in light of such knowledge, the adequate procedure to protect against future harm of the plaintiff was to immediately insert permanent fillings.

In conclusion, we remand to the district court for reconsideration in view of this opinion. The district court should focus its analysis on whether Dr. Hopper proceeded in the correct manner, especially considering the fact that temporary fillings had been in place for 3½ months longer than they should have been. The court should consider whether Dr. Hopper was negligent in not washing the canals with sodium hypochlorite or a similar antiseptic, and in not renewing the whole procedure over again on March 5. Ms. LaRoche's missed appointments should be viewed only in terms of whether Dr. Hopper knew or should have known of the greater likelihood of infection existing when he permanently filled the teeth.

The case is vacated and remanded. Costs assessed against the government.

---

**6.** The testimony shows the practice of culturing is a controversial procedure. Some experts strenuously advocate its use. *See* L. Grossman, *Endodontic Practice* 253, 279 (9th ed. 1978). Others, however, take the position that culturing is not necessary and could lead to incorrect analysis and treatment. *See generally* D. Morse, *The Endodontic Culture Technique: An Impractical and Unnecessary Procedure,* 15 Dental Clinics of North America 793 (1971); *cf.* S. Seltzer, *Endodontology, Biologic Considerations in Endodontic Procedures* 305 (1971) (Hobson concludes that "the culture ... has been shown to be inadequate at best, and thoroughly misleading at worst."). Dr. Richter, a South Dakota dentist testifying for the United States, stated that he knew of no one in South Dakota who did culturing. Dr. James stated that culturing is not a general practice in the Midwest.